## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARLES CONROY | : | Civil Action No. 09-cv-01215 |
| | : | |
| v. | : | |
| | : | |
| JBJ LIMOUSINE, INC. | : | |
| t/a JBJ LIMOUSINE | : | |
| and JBJ LIMOUSINE AND BUS, INC. | : | **Filed via Electronically** |

## <u>ORDER</u>

AND NOW, this         day of                          , 2009, upon consideration of Moving Defendants, JBJ Limousine, Inc. t/a JBJ Limousine and JBJ Limousine and Bus, Inc.'s <u>Daubert</u> Motion To Strike Plaintiff's Expert Reports of Elizabeth Trendowski and Lance Watt, it is hereby ORDERED AND DECREED that said Motion is granted as follows: Plaintiff's expert reports of Elizabeth Trendowski and Lance Watt are stricken from the record and both experts are precluded from testifying at trial in this matter.

BY THE COURT:

_____ J.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHARLES CONROY | : | Civil Action No. 09-cv-01215 |
| | : | |
| v. | : | |
| | : | |
| JBJ LIMOUSINE, INC. | : | |
| t/a JBJ LIMOUSINE | : | |
| and JBJ LIMOUSINE AND BUS, INC. | : | **Filed via Electronically** |

---

**DEFENDANTS', JBJ LIMOUSINE, INC. t/a JBJ LIMOUSINE and JBJ LIMOUSINE
AND BUS, INC., DAUBERT MOTION TO
STRIKE PLAINTIFF'S EXPERT REPORTS**

AND NOW, come the Moving Defendants, JBJ Limousine, Inc. t/a JBJ Limousine and

JBJ Limousine and Bus, Inc. (hereinafter referred to as "Moving Defendants"), by and through

their counsel, Weber, Gallagher, Simpson, Stapleton, Fires & Newby, LLP, hereby file this

Daubert Motion , and in support thereof, avers as follows:

1.      This cause of action arises from an alleged physical altercation which occurred on

or about 11/26/06.  See a copy of the Plaintiff's Complaint attached hereto as Exhibit "A".

2.      The Plaintiff's Complaint alleges that the Plaintiff came upon a parked limousine,

which contained minor and adult occupants who at the time were visibly intoxicated, whom

physically assaulted him without provocation or warning.  See Exhibit "A" ¶¶ 5-8.

3.      Plaintiff further avers that the occupants of the Moving Defendants' vehicle were

permitted and/or invited to drink alcohol to the point of intoxication. Id. at ¶ 12.

4.      It is also alleged that Moving Defendants knew or should have known that by

allowing and/or inviting the occupants to consume excessive amounts of alcohol, and then to

allow the limousine or van containing the occupants to be left unattended, that harm would, or

could be perpetuated, upon people or property. Id. at ¶ 13.

5.      Plaintiff avers that he sustained severe injuries as a result of the Moving Defendants' alleged negligence. Id. at ¶ 12.

6.      Plaintiff has produced two expert opinions in the instant matter that lack foundational basis.

7.      The criteria for the admission of expert testimony is set forth in FRE 702, which reads:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

8.      Thus, to be admissible, an expert's opinion must have a reasonable basis in the knowledge and experience of the relevant discipline. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

9.      The Supreme Court further recognized in Daubert, 509 U.S. at 579 that the trial judge should act to screen evidence to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. See, also, In re TMI Litigation, 193 F.3d 613, 663 (3d Cir. 1999).

10.      In the case of Kumho Tire Company, Ltd., et al. v. Carmichael, et al., 526 U.S. 137 (1999), the Supreme Court clarified that its Daubert analysis of was applicable to all types of expert opinions.

11.      The Supreme Court in Daubert requires trial courts to initially determine the validity of the methodology utilized by the expert and then whether the methodology applies to the circumstances in the case at bar. Daubert 509 U.S. at 592-593.

12.     The Plaintiff has produced in support of his alcohol/intoxication argument, an allegedly expert opinion from Elizabeth Trendowski, designated as a Dram Shop expert.  <u>See</u> Exhibit "B" which is the report and curriculum vitae offered as an expert opinion from Elizabeth Trendowski.

13.     However, this is not a Dram Shop case.

14.     The Moving Defendants are not a liquor licensee and never provided alcohol to its passengers on the day in question.

15.     There is also no evidence that the passenger/assailant was intoxicated at the time of the physical altercation.

16.     Moreover, the Plaintiff's expert is not qualified to provide an expert opinion in this matter because this is not a dram shop matter.

17.     Ms. Trendowski's opinion is also unreliable because it is based on unsupported factual and legal conclusions.

18.     Ms. Trendowski's opinion relies on standards set for liquor licensees; since the Moving Defendants are not liquor licensees, this opinion is not relevant to this cause of action.

19.     As such, Ms. Trendowski's report should be stricken for failure to pass the <u>Daubert</u> standard for expert admissibility.

20.     The Plaintiff has also produced an expert report from Lance Watt, a self-designated bus and truck expert who opines that the actions of the Defendant's bus driver in not controlling his passengers resulted in the assault on the Plaintiff.  <u>See</u> Exhibit "C" which is the opinion report and curriculum vitae of the Plaintiff's designated expert Lance Watts.

4

21.     However, Lance Watt is not qualified to offer such an opinion. Mr. Watt is only experienced in engineering and design of mechanical systems related to trucks and buses and is not an expert in security, passenger safety and/or bus safety/ operation.

22.     In addition Mr. Watt's opinion is unreliable because it is based on unsupported factual and legal conclusions.

23.     There also exists no law in the Commonwealth of Pennsylvania or standard used by the Plaintiff's expert to support his contention that Moving Defendants' driver should have prevented the passengers from exiting the vehicle.

24.     In fact, if the Moving Defendants' driver did prevent the passengers from exiting his vehicle it could have opened the Moving Defendants to liability such as false imprisonment.

25.     Thus, Mr. Watt's expert opinion fails the <u>Daubert</u> test and should be stricken from the record.

WHEREFORE, Moving Defendants request that their Motion to Strike be granted in their favor and that Plaintiff's Expert Reports be stricken from the record with prejudice.

Respectfully submitted,

**WEBER GALLAGHER SIMPSON
STAPLETON FIRES & NEWBY, LLP**

By:     // Robert D. MacMahon
        Robert D. MacMahon, Esquire
        Atty. I.D.: 54367
        Syreeta Peake, Esquire
        Atty. I.D.: 201327
        Attorneys for Defendants
        2000 Market Street, 13th Floor
        Philadelphia, PA  19103
        (215) 972-7900

Date:_____11/2/09_____

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

CHARLES CONROY          :     Civil Action No. 09-cv-01215
                          :
          v.             :
                          :
JBJ LIMOUSINE, INC.       :
t/a JBJ LIMOUSINE         :
and JBJ LIMOUSINE AND BUS, INC.  :     **Filed via Electronically**

---

## MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANTS', JBJ LIMOUSINE, INC. t/a JBJ LIMOUSINE and JBJ LIMOUSINE AND BUS, INC. <u>DAUBERT</u> MOTION TO STRIKE PLAINTIFF'S EXPERT REPORTS

Defendants, JBJ Limousine, Inc. t/a JBJ Limousine and JBJ Limousine and Bus, Inc. (hereinafter referred to as "Moving Defendants"), by and through their attorneys, Weber Gallagher Simpson Stapleton Fires & Newby LLP, submit the following memorandum of law in support of their <u>Daubert</u> Motion.

## I.    <u>PROCEDURAL HISTORY AND FACTS</u>

This cause of action arises from an alleged physical altercation which occurred on or about 11/26/06. <u>See</u> a copy of the Plaintiff's Complaint attached hereto as Exhibit "A". The Plaintiff's Complaint alleges that the Plaintiff came upon a parked limousine which contained minor and adult occupants who at the time were visibly intoxicated and physically assaulted him without provocation or warning. <u>See</u> Exhibit "A", ¶¶ 5-8. Plaintiff further claims that the occupants of the Moving Defendants' vehicle were permitted and/or invited to drink alcohol to the point of intoxication. <u>Id</u>. at ¶ 12. It is also alleged that Moving Defendants knew or should have known that by allowing and/or inviting the occupants to consume excessive amounts of alcohol, and then to allow the limousine or van containing the occupants to be left unattended, that harm would, or could be perpetuated, upon people or property. <u>Id</u>. at ¶ 13. Plaintiff avers

6

that he sustained severe injuries as a result of the Moving Defendants' alleged negligence. Id. at ¶ 12.

Plaintiff initially filed his Complaint in State Court and this case was removed to Federal Court on or about April 9, 2009 based on diversity. The Plaintiff produced expert opinions of Lance Watt, Bus and Truck Expert and Elizabeth Trendowski, Dram Shop Expert. For the following reasons, both of Plaintiff's expert reports should be stricken from the record.

## II.    **LEGAL ARGUMENT**

The criteria for the admission of expert testimony is set forth in FRE 702, which reads:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Thus, to be admissible, an expert's opinion must have a reasonable basis in the knowledge and experience of the relevant discipline. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). The Supreme Court further recognized in Daubert, 509 U.S. at 579, that the trial judge should act to screen evidence to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. See, also, In re TMI Litigation, 193 F.3d 613, 663 (3d Cir. 1999). In the case of Kumho Tire Company, Ltd., et al. v. Carmichael, et al., 526 U.S. 137 (1999), the Supreme Court clarified that its Daubert analysis of was applicable to all types of expert opinions.

The Supreme Court in Daubert requires trial courts to initially determine the validity of the methodology utilized by the expert and then whether the methodology applies to the circumstances in the case at bar. Daubert 509 U.S. at 592-593. While noting that a Daubert inquiry is a "flexible one" and that different factors will be applicable depending upon the circumstances, the Supreme Court set forth five non-exclusive factors that can be used in making

this evaluation:  1) can the theory or technique in question be tested; 2) has the theory or technique been subject to peer review and publication; 3) what is the known or potential rate of error for a particular technique; 4) are there standards that exist and are maintained that control the technique's operation; and 5) has the theory or technique been "generally accepted".  <u>Daubert</u> 509 U.S. at 593-594.  The criteria required to qualify an expert turns largely upon the subject matter of the particular opinion to be offered.  <u>Kerrigan v. Maxon Indus.</u>, 223 F. Supp. 2d 626, 635 (E.D. Pa. 2002).

For example, in <u>Kerrigan</u>, the Court limited the testimony of the Plaintiff's expert because the <u>Daubert</u> standard was not met.  <u>Id</u>. at 635.  In that case, the Court held that three elements had to be met prior to the admission of expert testimony, the expert had to be qualified in his area of expertise, his testimony had to be reliable, and it had to assist the trier of fact. <u>Id</u>. at 633.  The Court held that portions of the Plaintiff's expert's report did not meet the criteria. According to the Court, Plaintiff's expert was not qualified to testify as to the formulation and function of a shut-off valve because he had no engineering or design experience. <u>Id</u>. at 635.  The Court held:

> We find that although [Plaintiff's expert] may speak in general terms about the function of the hydraulic system (i.e., that it is the hydraulic system that enables the agitator to rise), [Plaintiff's expert] lacks the necessary background, experience and training to testify as to the proposed hydraulic line shut-off valve. [Plaintiff's expert] does not have any experience in designing or constructing hydraulic systems or safety devices intended to check their operation.  The areas of experience emphasized by Plaintiff, including machinery placement and movement, truck bed wrecker and installation and heavy truck maintenance and repair, do not suggest exposure to hydraulic systems in particular.  We agree with Defendant that [Plaintiff's expert's] understanding of the "principles of mechanics involved in the use of the power take-off attached to the engine, and its connection with the hydraulic equipment" does not establish his ability to testify as to the design and implementation of the proposed hydraulic line safety device and is not sufficient to qualify him to offer an expert opinion in this area. Defendant is correct that "it does not matter that [Plaintiff's Expert] might be able to discuss the basic mechanics with regard to hydraulic installation and possibly

safety designs connected with it.   What matters, in this case, and where [Plaintiff's expert] is lacking, is that he has no experience and/or expertise in construction equipment design, implementation, testing and/or warnings."

Id. at 636.

The Court further notes that the Plaintiff's expert's opinion is also not reliable because it fails to offer any designs, drawings, plans, demonstrations or working examples regarding his methodology. Id. 637-638.   As such, the Court ruled as a matter of law since the first two requirements were not met than the last requirement can also not be satisfied as such the Plaintiff's expert was precluded from offering testimony on the subject area in question.   Id. at 639.

In this case, the Plaintiff has produced two expert opinions regarding liability.   Both expert opinions fail to meet the Daubert standard for expert admissibility and should be stricken from the record.

### A.   The Expert Opinion of Elizabeth Trendowski Should Be Stricken

Plaintiff has produced in support of his argument regarding the duty of the Moving Defendants with regard to intoxicated passengers an expert opinion prepared by Elizabeth Trendowski, designated as a Dram Shop expert.   See Exhibit "B" which is the report and curriculum vitae of Elizabeth Trendowski.  However, this is not a Dram Shop case.  The Moving Defendants are not a liquor licensee and there is no evidence that Moving Defendants served alcohol to its patrons on the day of this incident.   Thus, Plaintiff's expert opinion is not even applicable and/or relevant to the instant matter.

The Plaintiff's expert is also not qualified to offer an expert opinion as applicable to the actions of the Defendants' driver in this case.  The present matter requires an expert to opine on the duty of a driver of a bus to a non-passenger who was injured.  Ms. Trendowski is not an

expert in safety and/or bus operation. Her curriculum vitae states that she has a college education in Education and Biology. Her experience is limited to the areas of dram shop issues, and liquor liability. She has life experience as a liquor permittee and in the area of bartending. However, none of Ms. Trendowski's experience listed on her curriculum vitae pertains to the areas of safety, operation of a bus and/or duty of a non- servicer of alcoholic beverages to bus patrons. The Moving Defendants are not licensed providers of alcoholic beverages and did not supply any of their passengers with alcohol. Plaintiff and his expert have not produced any evidence to the contrary. Thus, Ms. Trendowski is not qualified to give an expert opinion on issues in this case which fall outside of her expertise.

The Plaintiff's expert opinion is also not reliable because it cites law and standards that have no applicability to the instant cause of action. Ms. Trendowski cites N.J.S.A. 39:4-51(a) which explicitly states that it does not apply to a passenger of a charter or special bus or a limousine service. She also cites N.J. S.A. 33:1-12(4) which specifically applies to liquor licensees which the Moving Defendants are not. She further contends that provisions of New Jersey Alcohol Beverage Control were violated; however, she cites to no specific rule in the handbook or law which was violated. Moreover, the New Jersey Alcohol Beverage Control has no specific guidelines applicable to limousine/bus companies, despite what is mentioned in Ms. Trendowski's report.

Ms. Trendowski also relies on the hospitality industry standards as a basis for her expert opinion in this matter regarding the safety of passengers in a bus/limousine. However, this is also not relevant to the instant cause of action. Moving Defendants are not liquor licensees and therefore can not be held to the standard imposed on liquor licensees. How is the standard applied to the hospitality industry which is made up of bar establishments relevant to a cause of

action involving a bus/limo driver who does not serve alcohol?  Plaintiff's expert provides no basis for why she would apply such a standard in this case.  Similarly, Ms. Trendowski relies on guidelines established by Training for Intervention Procedures (TIPS) which is classified as the "global leader in education and training for the responsible service, sale, and consumption of alcohol".  See Exhibit "D".  There is no evidence that either the hospitality standard/ and/or the Training for Intervention Procedures is an industry standard used by bus/limousine companies and/or is relevant to a cause of action which involves a non-servicer of alcohol.  There is also no evidence that these standards have been used in prior cases and/or have been peer reviewed.

The Plaintiff's expert also relies on standards that are not grounded in the law.  Plaintiff's expert indicates that Moving Defendants' driver was not given proper training regarding keeping passengers safely on the bus when it became disabled.  She cites the National Safety Council to support the contention that because the Moving Defendants' driver did not properly monitor the bus it became an "attractive nuisance" to Mr. Conroy.  However, Mr. Conroy was an adult individual at the time of this incident and under the law the attractive nuisance doctrine does not apply to adult individuals.  Powell v. Ligon, 5 A.2d 373 (Pa. 1939).  It is unclear whether Plaintiff's expert is even aware that the standard she asserts in her report is not even applicable to the situation.

In addition, the Plaintiff's expert also alleges that Moving Defendants' driver should have prevented the passengers of its vehicle from exiting.  However, if the Moving Defendants' driver forced its passengers to stay on the bus against their will it would have opened up the Moving Defendants to liability for false imprisonment.  Thus, it would seem implausible for a driver to force its passengers to stay on a bus against their will.

11

Even further, Ms. Trendowski's report is not reliable because her opinion is based on unsupported factual conclusions. For example, Ms. Trendowski claims that the Moving Defendants had minors in their vehicle.  However, she fails to cite any evidence produced in the record that supports this bald allegation.  She makes a speculative conclusion which is contrary to the testimonial evidence in this case.  Specifically, a passenger, Janene Castellucci testified:

Q:    You were 21 at the time of this trip, correct, Janene?

A:    Correct.

Q:    Tara was 21 at the time?

A:    No.

Q:    How old is Tara?

A:    She's 28 now.

Q:    Oh, okay. Tara's older?

A:    Yes.

Q:    What about Dave Maryles, was he 21 or older at the time?

A:    He's 27 now.

Q:    How about Louis Cacciola, was he 21 or older at the time?

A:    Older.

Q:    All right.  What's Nick's birthday?

A:    7/20/1985.

Q:    Okay. So Nick was 21 or older at the time?

…

A:    Yes

Q:    Okay. How about Eileen Mantantici, was she 21 or older at the time?

A:      Yes, she's older than me.

Q:      Okay. How about Brittany Crocetto, was she 21 or older at the time?

A:      Yes. I believe everyone on the bus was of age.

Q:      When you say, of age, you mean 21 or older?

A:      Twenty-one or older.

See a true and correct copy of Janene Castellucci's deposition testimony taken August 3, 2009,

attached as Exhibit "E", pp, 28-29.

Plaintiff's expert has no basis to support her conclusion that Moving Defendants had minors on

its bus on the night in question.

Further, Plaintiff's expert makes bald assertions that Moving Defendants' passengers

were intoxicated on their bus.  Ms. Trendowski is not a toxicologist and has no basis for any

conclusions made in her report regarding the level of intoxication, if any, of the Moving

Defendants' passengers.  In fact, no one's blood or alcohol level was ever measured on the day

of the incident.   Therefore, any allegations regarding intoxication are mere speculative

conclusions made by the Plaintiff's expert.  Her conclusions are not reliable and not based on

any evidence in the record.

Thus, the Plaintiff's expert's opinion would not assist the trier of fact in this matter.  The

Plaintiff's expert conclusions are entirely based on assertions not grounded in fact or law and

thus not reliable.  Ms. Trendowski is not qualified in the area of passenger safety for common

carriers, bus operation and/or bus safety etc.  Thus, Ms. Trendowski's expert opinion should be

stricken as a matter of law from the record.

**B.**   **The Expert Opinion of Lance Watt Should Be Stricken**

The Plaintiff has produced an expert report from Lance Watt which also fails the <u>Daubert</u> standard.   Lance Watt opines that the actions of the Moving Defendants' bus driver in not properly monitoring their vehicle resulted in the assault on the Plaintiff.   <u>See</u> Exhibit "C" which is the opinion report and curriculum vitae of expert Lance Watts.   The Plaintiff's expert opinion suggests that Moving Defendants' driver, in not preventing the passengers from getting off the bus after it had broken down, acted negligently.   However, Lance Watt is not qualified to give such an opinion.   According to his curriculum vitae, Mr. Watt has no experience in bus passenger safety or operation.   He has no educational background in this area as well.   Mr. Watt's credentials primarily are concentrated in the mechanical design and engineering of transit and commercial vehicles.   Thus, he is qualified in only the mechanical aspects of a bus.   Mr. Watt's experience does not make him qualified in the area of bus passenger safety and/or operation to provide an opinion as to what a bus driver should do to ensure the safety of its passengers, etc.

Even further, Mr. Watt's opinion is not reliable.   Mr. Watt's opinion is based on unfounded conclusions.   He indicates that the Moving Defendants' vehicle was not being properly inspected and maintained as required under Federal Motor Carrier Safety Regulations because it had battery failure.   However, Mr. Watt provides no basis for this conclusion.   Mr. Watt's opinion is grounded in speculation.   He never examined the bus, reviewed the maintenance records for the bus in question and/or presented any evidence which provides a basis for this conclusion.

In addition, Mr. Watt relies on Keller's Motorcoach Driver's Safety Handbook for the proposition that Moving Defendant's driver should have monitored its passengers.   However,

14

Keller's Motorcoach Driver's Safety Handbook does not specifically require Moving Defendants' driver to monitor the every movement of its passengers. The handbook suggests that the coach is the "safest place for the passengers" but does not require the driver to ensure that its passengers do not exit the coach and does not provide any instructions for what a bus driver is to do for its passengers when its vehicle is not functioning.

Moreover, there is no law in the Commonwealth of Pennsylvania and/or standard cited by the Plaintiff that states that a driver of a malfunctioning, *i.e.*, broken-down, vehicle must absolutely prevent the passengers from getting off of the vehicle. If the Moving Defendants' driver did prevent its passengers from exiting their vehicle then the driver would open up Moving Defendants to potential liability to crimes such as false imprisonment. Thus, the Plaintiff's expert does not provide any foundation for his conclusions regarding what a driver should do to protect its passengers and/or vehicle when its vehicle is not working. Mr. Watt also does not indicate what the industry standard in this situation would be and any specific guidelines used by drivers in this situation.

Mr. Watt's expert opinion also would not assist a trier of fact. His testimony is not supported and not grounded in any standard of the industry. He is not qualified as an expert in the area of duty of care owed by bus drivers, bus safety, passenger safety and/or operation. Thus, his opinion would confuse the issues for a jury. As such, his opinion should be stricken from the record as a matter of law.

### III.   <u>CONCLUSION</u>

WHEREFORE, Moving Defendants requests that their <u>Daubert</u> Motion be granted and Plaintiff's expert opinions be dismissed with prejudice.

Respectfully submitted,
**Weber Gallagher Simpson**
**Stapleton Fires & Newby LLP**

By:      <u>// Robert D. MacMahon</u>
Robert D. MacMahon, Esquire
Atty. I.D.:  54367
Syreeta Peake, Esquire
Atty. I.D.:  201327
Attorneys for Defendants
2000 Market Street, 13th Floor
Philadelphia, PA  19103
(215) 972-7900

Date:      <u>11/2/09</u>

## CERTIFICATE OF SERVICE

    I, Syreeta Peake, Esquire, do hereby certify that on this 2nd day of __November__ , 2009,

I served via first-class mail, postage prepaid, and a true and correct copy of the within Daubert

Motion, electronically and via first class mail, postage prepaid on the following individual:

James N. Gross, Esquire
1616 Walnut Street
Suite 1110
Philadelphia, PA 19103


                      _____// Syreeta Peake_____
                      Syreeta Peake, Esquire
                      Attorney for Defendants
                      JBJ Limousine, Inc. t/a JBJ Limousine
                      and JBJ Limousine and Bus, Inc.

# EXHIBIT "A"

JAMES N. GROSS, ESQUIRE
IDENTIFICATION NO.: 40715
1616 WALNUT STREET, SUITE 1110
PHILADELPHIA, PA 19103
TELEPHONE NO.: 215-670-9926
FACSIMILE NO.: 215-569-3723

**ATTORNEY FOR PLAINTIFF**

| | |
|---|---|
| CHARLES CONROY | : |
|     Plaintiff | : |
|     v. | : |
| JBJ LIMOUSINE, INC. | : |
| t/a JBJ LIMOUSINE | : |
|     Defendant | : |
|     v. | : |
| JBJ LIMOUSINE AND BUS, INC. | : |
|     Additional Defendant | : |

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY
CIVIL TRIAL DIVISION

NOVEMBER TERM, 2008

NO.   001961

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| YOU HAVE BEEN SUED IN COURT. IF YOU WISH TO DEFEND AGAINST THE CLAIMS SET FORTH IN THE FOLLOWING PAGES, YOU MUST TAKE ACTION WITHIN TWENTY (20) DAYS AFTER THIS COMPLAINT AND NOTICE ARE SERVED, BY ENTERING A WRITTEN APPEARANCE PERSONALLY OR BY ATTORNEY AND FILING IN WRITING WITH THE COURT YOUR DEFENSES OR OBJECTIONS TO THE CLAIMS SET FORTH AGAINST YOU. YOU ARE WARNED THAT IF YOU FAIL TO DO SO THE CASE MAY PROCEED WITHOUT YOU AND A JUDGMENT MAY BE ENTERED AGAINST YOU BY THE COURT WITHOUT FURTHER NOTICE FOR ANY MONEY CLAIMED IN THE COMPLAINT OR FOR ANY OTHER CLAIM OR RELIEF REQUESTED BY THE PLAINTIFF. YOU MAY LOSE MONEY OR PROPERTY OR OTHER RIGHTS IMPORTANT TO YOU. | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al patir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades o otros derechos importantes para usted |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER. | LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO. VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGA |
| IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH SOME INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE. | |
| PHILADELPHIA BAR ASSOCIATION LAWYER REFERRAL AND INFORMATION SERVICE 1101 MARKET STREET, 11ᵀᴴ FLOOR PHILADELPHIA, PA 19107 TELEPHONE: (215) 238-6300 | ASOCIACIÓN DE LICENCIADOS DE FILADELFIA SERVICIO DE REFERENCIA E INFORMACIÓN LEGAL 1101 MARKET STREET, 11ᴿ FLOOR FILADELFIA, PENNSYLVANIA 19107 Telefono: (215) 238-6300 |

'03/03 2009 14:11 FAX 18563848747      MARKS INS. GROUP                                    ☑002

Mar 03 09 01:40p    james johnson          856-228-7402           p.2

JAMES N. GROSS, ESQUIRE
IDENTIFICATION NO.: 40715
1616 WALNUT STREET, SUITE 1110
PHILADELPHIA, PA 19103
TELEPHONE NO.: 215-670-9926
FACSIMILE NO.: 215-569-3723

**ATTORNEY FOR PLAINTIFF**

| | |
|---|---|
| CHARLES CONROY<br>Plaintiff | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY |
| v. | CIVIL TRIAL DIVISION |
| JBJ LIMOUSINE, INC.<br>t/a JBJ LIMOUSINE<br>Defendant | NOVEMBER TERM, 2008 |
| vs. | |
| JBJ LIMOUSINE AND BUS, INC.<br>Additional Defendant | NO.   001961 |

## COMPLAINT – CIVIL ACTION
## 2O-PERSONAL INJURY-OTHER

Plaintiff, by and through his attorney, James N. Gross, Esquire pleads and alleges as follows:

1.      Plaintiff is Charles Conroy at all times herein a resident of the city and county of Philadelphia.

2.      JBJ Limousine, Inc. t/a JBJ Limousine is a New Jersey Corporation maintaining a business address of 109 N. Black Horse Pike, Blackwood, NJ 08012.

3.      Defendant JBJ Limousine and Bus, Inc. is a registered New Jersey Corporation with its business address at 100 Crestview Drive, Woodbury, NJ 08096.

Case ID: 081101961

03/03/2009 14:12 FAX 18563848747                    MARKS INS. GROUP                                              ☑003

Mar 03 09 01:41p      james johnson                    856-228-7402                    p.3

4.      Defendants are in the business of providing limousines, vans and other vehicles of a similar nature for hire.

5.      On 11/26/06 the defendants provided for rental a limousine with an attendant driver for use by minors and adult individuals.

6.      That the occupants of the limousine became intoxicated and came into contact with the plaintiff.

7.      That at the time the occupants of the defendants' limousine came into contact with the plaintiff, defendants' limousine was parked in the 300 block of Market Street in Philadelphia, PA.

8.      That upon the plaintiff coming upon the limousine, certain of the minor and adult occupants, who at that time were visibly intoxicated, physically assaulted the plaintiff, without provocation or warning, causing him severe injuries.

9.      That at the time of the assault, the driver and/or attendant for the limousine, provided by the defendants' companies, had abandoned the vehicle and its occupants.

10.      As a result of the assault, Plaintiff sustained numerous fractures in his nose and face with residual damage in the right ocular region.

11.      Plaintiff avers that defendants should have foreseen that the occupants, could or would, cause harm to people or property.

12.      The occupants, some being under 21 years of age and others just having turned 21 years of age, were permitted and/or invited to drink alcohol to the point of intoxication.

Case ID: 081101961

03/03/2009 14:12 FAX 18563848747         MARKS INS. GROUP
Mar 03 09 01:41p      james johnson                        ☒004
                                        856-228-7402
                                                      P.4

13.    Defendants knew or should have known that by allowing and/or inviting the occupants to consume excessive amounts of alcohol, and then to allow the limousine or van containing the occupants to be left unattended, that harm would, or could be perpetrated, upon people or property.

14.    That defendants owed a duty of care to those, such as the plaintiff, to protect against the imposition of harm upon knowing that their limousine/van would be hired for the purpose that it was.

15.    That defendants breached their duty of care owed to the plaintiff by allowing and/or inviting the consumption of excessive amounts of alcohol, by minor occupants and those having just turned 21 years of age, and thereafter allowing the limousine/van and its occupants to be left unattended for a period of time.

16.    The injuries sustained by the plaintiff, as described above, were a direct and proximate result of defendants' reckless, wanton and negligent conduct in permitting and/or inviting the consumption of alcoholic beverages to minors and non-minors in a scenario such as the instant one.

17.    Defendants' conduct in permitting and/or inviting the consumption of alcohol by minors facilitated violation of 18 Pa.C.S.A.§6308 (relating to the possession, consumption or transportation of alcohol by minors) and any and all applicable statutory provisions maintained by the Pennsylvania Liquor Control Board.

WHEREFORE, the Plaintiff prays for judgment against the Defendants, jointly and severally, for damages for past, present and future medical expenses, past present and future pain

Mar 03 09 01:42p     james johnson          856-228-7402              p.5

and suffering, loss of enjoyment of life, in excess of $50,000.00, plus punitive damages,

attorney's fees, costs of suit and for such other and further relief as this Court deems appropriate.

BY: _____
JAMES N. GROSS, ESQUIRE
ATTORNEY FOR PLAINTIFF,
CHARLES CONROY

## VERIFICATION

I, Charles Conroy verifies that the facts set forth in the foregoing Complaint are true and correct to the best of my information, knowledge and belief.

I understand that the statements contained herein are subject to the penalties of 18 Pa. C.S.A., §4904 relating to unsworn falsification to authorities.

CHARLES CONROY

DATE: 2/27/09

Case ID: 081101961

# EXHIBIT "B"

**EXPERT'S REPORT**

**OF THE**

**CHARLES CONROY INJURY**

**By:**

**Elizabeth A. Trendowski**

**September 25, 2009**

**Robson Forensic**
Engineers, Architects, Scientists & Fire Investigators

## CHARLES CONROY INJURY

**EXPERT'S REPORT**                                           **SEPTEMBER 25, 2009**

### A.   INTRODUCTION

On November 26, 2006, Charles Conroy walked down Market Street, Philadelphia, PA with two friends.  He noticed a limo/bus (hereafter called 'bus') disabled at the curb and decided to find out if he could assist.  He stepped onto the bus and asked the passengers if they needed help.  Mr. Conroy was met with vulgarities and had a cup of liquor thrown at him.  He proceeded to push a cup of beer from a table onto the floor and left.

Five of the male passengers chased Mr. Conroy and assaulted him causing severe injuries to his face and eye.

The purpose of my investigation was to determine if the action/inaction of JBJ Limousine created unreasonably dangerous conditions for Mr. Conroy which caused his injuries.

### B.   MATERIALS AVAILABLE FOR REVIEW

1. Charles Conroy statement 11/6/07
2. Charles Conroy medical reports
3. Answer to plaintiff's complaint with affirmative defenses
4. Deposition James Brian Johnson  6/11/09
5. Deposition Charles Conroy 5/20/09
6. Deposition William Ervin 5/20/09
7. Oral transcript  testimony Janene Castellucci 8/3/09
8. Richard Hallowell, Esq. letter to James gross 12/27/07
9. Nick Ryan oral transcript testimony 8/3/09
10. Complaint 11/08
11. Investigator Report by Stephen Koerper
12. Police report 11/27/06

### C.   BACKGROUND

On November 26, 2006, Janene Castellucci's mother hired JBJ Limousine, Inc. to take her and her invited guests into Philadelphia to celebrate her daughter's twenty-first birthday.  The limousine arrived at the Castelucci's home around 8:00 pm on November 25, 2006 and picked up approximately twenty passengers.



**Robson Forensic**
Engineers, Architects, Scientists & Fire Investigators

1

The passengers brought a ¼ keg of beer into the limo/bus (hereafter called "bus") to drink en route to Philadelphia for a birthday night celebration of bar hopping.

William Ervin was the driver of the bus that evening. He dropped his passengers off at the Mad River Pub on 2nd and 3rd street in Philadelphia and picked them up around 2:00 am.

The bus broke down immediately after picking them up around the Market Street area. Mr. Ervin called JBJ owner, James Brian Johnson and requested he bring another vehicle to transport the passengers home.

Mr. Ervin made a call for service and then left the vicinity of the bus.

Charles Conroy was walking down the street with his two friends, Nick Sloms and Nick Loberto. Mr. Conroy noticed the broken down bus and told his friends that he wanted to see if the passengers on board needed any help.

Mr. Conroy testified in his deposition that he did not see a driver anywhere around the bus and decided to board it. He walked onto the bus and asked the passengers if they needed any help. Someone from the bus threw something at him and was told to "F___ off" the bus.

Just before leaving the bus, he pushed a paper cup with beer in it from a table and it spilled. The male passengers began yelling and ran after Mr. Conroy and his two friends who had been outside the bus. Mr. Lomberto testified in his deposition that the women from the bus told them to "calm down". Mr. Stoms tried to reason with the male passengers and also asked them to "calm down" and was immediately punched in the face and knocked down. He was kicked in the jaw by one of the men and that's when Mr. Loberto stepped in front of him to stop the men from assaulting him. When Mr. Sloms and Mr. Loberto turned to look for Mr. Conroy, he was on the ground being punched and kicked by the assailants. Mr. Conroy's face was covered with blood.

Nick Loberto called 911 and the police arrived immediately as they were already in the vicinity and patrolling the area. The police interviewed Nick Curiale and Jason Williams. They were invited guests of Ms. Castalucci and were listed as suspects on the police report, but were not arrested.

Mr. Ervin testified that he never saw Mr. Conroy enter the bus nor did he witness the assault.

When the assault was over, he was in the replacement limousine waiting to leave.

Mr. Conroy was taken to the hospital with face and eye injuries.



**Robson Forensic**
Engineers, Architects, Scientists & Fire Investigators

2

## D.   ANALYSIS

Charles Conroy was injured when he was unnecessarily and unreasonably exposed to the hazards of intoxicated people.  The combination of hazard and exposure created unreasonably dangerous conditions which was a cause of his injury.

On Saturday, November 25, 2006, JBJ Limousine, Inc. picked up their customer Janene Castalucci, who was celebrating her 21st birthday by going barhopping in Philadelphia with twenty friends.  Ms. Castaucci and her friend, Nick Ryan both stated in their oral testimony that there was a ¼ keg of beer to drink in paper cups. They began drinking 'en route to barhopping that evening in the bus.

[1]The New Jersey Alcohol Beverage Control (NJABC) states that passengers may not bring alcohol onto a limousine for their own consumption.  Passengers may only consume alcohol in a limousine that is licensed by the NJABC and then the passenger must consume the alcohol that the limo provides.  JBJ limousine was in violation of the NJABC by allowing Ms. Castalucci and her friends to bring a ¼ keg beer onto the bus for consumption.

Mr. William Ervin was the driver of the bus that evening testified in his deposition that that there was no alcohol on the bus that evening, even though the client, Ms.Castalucci and Mr. Ryan stated that there was a ¼ keg of beer on board.  A reasonably attentive driver would have noticed the ¼ keg of beer in the back of the bus with twenty passengers drinking out of paper cups.  The interior bus design was open and the line of sight from driver to passengers was clear and unobstructed.

JBJ driver, Mr. Ervin recalled that the occasion was a 21st birthday celebration.  Though JBJ was transporting Ms. Castalucci who had just turned 21 years old and young friends, the driver did not check any identification to ensure his drinking passengers were all of legal age to consume alcohol.

If a limousine service carries passengers under the age of 21 and minors are found to be drinking alcohol, the limo service may be fined $ 3000.00 by the New Jersey Alcohol Beverage Commission.  Though Mr. Ervin understood the responsibility for allowing alcohol on the bus, he failed to check the identifications.  Since Ms. Castalucci just turned 21 years old, it is only reasonable that her friends were of similar age that evening.

JBJ had notice that the party was going out barhopping that evening and that they were likely to consume more alcohol when they were dropped off around the bars, since that was their intent.  JBJ limo was also aware that dropping off his passengers around 9:00 pm and picking them up again at 2:00 am, meant that they would be drinking alcohol for five more hours by the time they finished and were back on the bus.

---

[1] NJSA 39:4-51(a) and NJSA 33:1-12(4)



**Robson Forensic**
Engineers, Architects, Scientists & Fire Investigators

When JBJ picked up Ms. Castalucci and her guests at 2:00 am, the bus broke down almost immediately. JBJ had a bus of twenty passengers who had just returned from drinking alcohol for five hours and the JBJ driver left the vicinity of the disabled bus. His inaction to provide reasonable care and instruction to his intoxicated passenger's while the bus was disabled breached the hospitality industry standards.

Once the bus became disabled, JBJ was responsible for controlling the people within the vehicle. JBJ had a duty to maintain the safety of the passengers and of third parties. This was the equivalent of a bar full of intoxicated patrons.

**When a bar encounters a situation like this, hospitality industry best practices are:[2]**

> a. Keep intoxicated patrons from injuring themselves or others. Intervention procedures must be applied such as monitoring patrons' behavior and check for signs of intoxication such as lowered inhibitions or impaired judgment.

A reasonably attentive driver would have noticed that several of the passengers were likely intoxicated and created a hazard to themselves and to third parties. Once the JBJ driver left the vicinity of the bus, he relinquished control of the environment. A private carrier like JBJ transporting intoxicated persons can reasonably foresee that passengers may not be fully capable of making rational decisions in certain situations like the incident that occurred on November 26, 2006 at 3:15 am.

Nick Curiale was a passenger with the party and in the limo/ bus that evening and early morning. He told the investigator, Stephen Koerper that he was definitely drunk and only remembered a few facts surrounding what happened. He said that he was "unsure of where the driver was or if he was even there."

> **b. Don't allow intoxicated patrons out of your sight. Be sure you keep them supervised and in a safe environment.**

There were alcohol impaired passengers on board the bus that early morning at 2:00 am. They should have been monitored and in direct sight of the driver at all times once they were back on the bus. Mr. Ervin left the vicinity of the bus to get a replacement vehicle. He should have remained with the bus, thus ensuring the safety of the passengers and any third party from the intoxicated passengers. Charles Conroy walked toward the bus around 2:30 am, saw no one supervising it and walked onto it. Without JBJ supervising the intoxicated passengers on the bus, Mr. Conroy was directly exposed to the hazard of the intoxicated passengers.

---

[2] Training for Intervention Procedures (TIPS)


**Robson Forensic**
Engineers, Architects, Scientists & Fire Investigators

4

### c. Exercise reasonable care.

Exercising reasonable care in a bar would mean observing patrons as they were drinking and assessing the situation continuously. While JBJ did not technically 'serve' the alcohol on the bus, they were in the position of exercising reasonable care once the bus became disabled. At that point, JBJ was in a supervisory position and as such failed to exercise reasonable care such as physically remaining on the bus or within sight to keep drunken passengers safe from harming themselves by leaving the vicinity and to keep third parties safe from being exposed to the drunken passengers. **The failure of JBJ driver to recognize the dangerous condition of exposing the public to intoxicated passengers was a proximate cause of the incident.** Had JBJ driver complied with safe industry practices, Mr. Conroy would not have been injured. JBJ failed to act in a manner expected of a reasonable person in like circumstances.

The National Safety Council created guidelines and strategies to advance safety as a core value in businesses for preventing nonemployee accidents. [3] Applicable guidelines were non-existent at the time of this incident. JBJ failed to provide the driver with an operations manual, policies, and procedures of training in any way.

**JBJ violated the practices of the National Safety Council by failing to properly train Mr. Ervin in policies and procedures. This was a proximate cause of the incident.**

The failure of JBJ to comply with existing and applicable guidelines by the National Safety Council deprived Mr. Conroy of the protection provided by those guidelines.

Limousine services are accustomed to being hired by passengers for the purpose of drinking without driving. That is a common fact pattern. The public is entitled to more from JBJ than to simply allow drunken passengers to continue to consume as much alcohol as they wish and then go unsupervised. The limo service had a duty of care, to take reasonable steps when it broke down to keep passengers safely on the bus. **JBJ failed to keep third parties safe by relinquishing control of the environment by leaving the vicinity of the bus with intoxicated passengers on board while it was disabled. This was a proximate cause of the incident.**

JBJ had a responsibility to monitor the activities of their passengers in an effort to prevent injuries. JBJ was responsible to provide reasonable care to their passengers that evening and early morning and to be motivated as to prevent them from hazardous conditions. JBJ should have been in the vicinity to prevent Mr. Conroy from entering the bus and thus preventing the injury. JBJ failed to do so. Mr. Ervin should have told the passengers that he was calling for a back up limousine and that (they), the passengers would need to stay inside the bus. **JBJ's failure to take precautions before leaving the bus with intoxicated passengers on board was a cause of the incident.**

---

[3] National Safety Council Handbook 1992

The bus was hired for the purpose of Ms. Castalucci's 21st birthday celebration to transport her and her friends to Philadelphia bars so they could go drinking and not have to worry about driving home.  JBJ is in the business of providing transportation and knew the purpose of this hire.  JBJ breached their duty of care owed to Mr. Conroy by allowing the limo and its occupants to go unattended for a period of time.

It is foreseeable that if patrons have been drinking in a bar for five hours and the bar staff then leaves the vicinity of the bar by physically walking out of the property that something bad may happen in the bar.  It is also foreseeable that if a bus full of intoxicated passengers is unsupervised, then something bad may happen.

As early as 1992, the National Safety Council's *Accident Prevention Manual for Business and Industry* 10th edition, recognized the importance of preventing nonemployee accidents and that some businesses by their very nature have special accident control problems.  It states "all types of transportation - not only involves maintenance and vehicle or unit operation safety but also the safety of areas *around* the vehicles..."[4]

The National Safety Council goes on to say that "companies can also suffer losses caused by the public's curiosity about company items or operations, known as "Attractive Nuisances."  Examples included unattended vehicles, construction sites, and goes on to say that firms must follow state and local ordinances and guidelines for preventing the public from gaining access to these "Attractive Nuisances" and being injured or killed as a result.  JBJ driver left the bus unattended with intoxicated passengers on board. [5]

**Mr. Conroy walked onto the vehicle curious to know if they needed help.  Mr. Conroy was injured as a result of being exposed to intoxicated passengers aboard the bus.  This was a proximate cause of the incident**

Limousine services have a responsibility for the well being of their patrons and third parties who may have contact with the limousine.  To accomplish this, drivers of limousines must monitor passenger activities for potential problems.  A reasonably attentive driver would have seen that after five hours of alcohol consumption by some of his passengers that they would be intoxicated.  Controlling the hazards and protecting people from injury are industry standards in the hospitality industry.  JBJ driver failed to control the hazard (intoxicated passengers) and failed to protect people from injury (Mr. Conroy).

---

[4] National safety council accident prevention manual 1992 page 499
[5] National safety council accident prevention manual 1992 page 501



**Robson Forensic**
Engineers, Architects, Scientists & Fire Investigators

6

## E.   FINDINGS

Within the bounds of reasonable professional certainty, and subject to change if additional information becomes available, it is my professional opinion that:

1. The failure of JBJ"s driver to recognize the dangerous condition of exposing intoxicated passengers to the public was a proximate cause of the incident.

2. JBJ Limousine, Inc. failed to keep third parties safe by relinquishing control of the environment and leaving the vicinity of the bus with intoxicated passengers onboard while it was disabled. This was a proximate cause of the incident.

3. JBJ Limousine, Inc. violated the practices of the National Safety Council by failing to properly train Mr. Ervin in policies and procedures. This was a proximate cause of the incident.


*Elizabeth A. Trendowski*

**Elizabeth Trendowski**
**Dram Shop Expert**

# Robson Forensic
**Engineers, Architects, Scientists & Fire Investigators**

## ELIZABETH A. TRENDOWSKI
### Dram Shop Expert

## PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| 2007 to present | **Robson Forensic, Inc.**<br>*Connecticut Area Manager*<br>*Associate* | Oct. 2008-present |

Provide technical investigations, analysis, reports, and testimony towards the resolution of litigation in the areas of dram shops and liquor liability for on and off premises liquor permittees, and issues of supervision, i.e. cases involving underage drinking and the responsibility of parents, party hosts, schools, fraternities, etc. TIPS or SMART certified over 200 police officers, liquor agents and security professionals around the country.

**2006 to present**   **University of New Haven, School of Hospitality**
*Adjunct Professor*
HR-315 is a three-credit, junior-level course in Bar and Beverage Management. This course teaches hospitality students the mechanics of operating a successful beverage operation whether it is in a five-star dining facility or a large sports coliseum. Students learn how to master costs, set-up, labor and legal issues. Students also participate in the S.M.A.R.T. trainer certification workshop where upon successful completion they are certified S.M.A.R.T. trainers able to certify their own staff as needed.

**1999 to 2008**   **Servers and Managers Alcohol Responsibility Training** (S.M.A.R.T. Programs)
*CEO*
Created national certification course in the responsible service of alcohol. This program also includes checking identifications properly, intervention and a certification test. To date there are over twenty-two thousand certified S.M.A.R.T. servers and over four hundred and fifty certified S.M.A.R.T. trainers.

S.M.A.R.T. Programs is a certified alcohol server program dealing with the issues of alcohol in the marketplace. S.M.A.R.T workshops facilitate what alcohol is, the effects of alcohol on guests, checking IDs properly, legal issues, intervention as well as guest relations. There is a certification test at the end of the workshop where participants need to receive seventy-five percent correct to become certified.

**1993 to present**   **The Beverage Journal**
*Columnist*
Wrote "S.M.A.R.T. Things" for monthly hospitality industry column focusing on liquor liability issues, staff training and current interests in the hospitality industry.

# Robson Forensic
**Engineers, Architects, Scientists & Fire Investigators**

## ELIZABETH A. TRENDOWSKI
### Dram Shop Expert

**2002 to 2005**   **Banana Dog Distributors**
*President/Owner*
Wholesale liquor permittee / out-of-state shipper permittee.  Operated a wine, spirits and beer wholesale operation providing products to retail outlets in Connecticut. Banana Dog closed in March 2005.

**1988 to 2005**   **S.M.A.R.T. Bartending**
*Owner*
S.M.A.R.T. (Servers & Managers Alcohol Responsibility Training). This is a dual certification, 16-hour 'hands-on' course on mixing and preparing today's most popular cocktails, opening and closing duties and product knowledge.  It also includes the S.M.A.R.T. certification.  To date, there have been over 15,000 bartenders who have graduated through the program.  S.M.A.R.T. Bartending was sold in 2005.

**1992 to 2002**   **Department of the U.S. Navy M.W.R.** (Morale, Welfare & Recreation)
*Instructor*
Taught Hospitality Courses including mixology, flash bartending and responsible service of alcohol using T.I.P.S., S.M.A.R.T. AND C.A.R.E.

**1988 to 2001**   **TIPS**
*Trainer / Master Trainer*
Training for Intervention Procedures of Alcohol servers program.  Health Communications in Washington, DC developed this program in 1986.  One of the first Trainers for TIPS and one of only three independent Master Trainers in the United States.  A Master Trainer is certified to train participants to teach the T.I.P.S. Program

**1991 to 1996**   **Mixin' Magazine**
*Columnist*
Wrote "S.M.A.R.T. Things" for monthly hospitality industry column focused on mixology and liquor liability issues.

**1987 to 1988**   **Yankee Drummer Hotel** (currently known as The Ramada Hotel), Auburn, MA
*Assistant General Manager*

**1985 to 1987**   **Legal Seafoods Restaurants**, Park Plaza Hotel, Boston, MA
*Food and Beverage Manager*

# Robson Forensic
**Engineers, Architects, Scientists & Fire Investigators**

## ELIZABETH A. TRENDOWSKI
### Dram Shop Expert

## LICENSES, PERMITS and CERTIFICATIONS

Be a Responsible Server (B.A.R.S.), Certification, North Carolina, June 2009
Techniques of Alcohol Management (T.A.M.), Certification, 2008
Sexual Harassment Training, Certification, Connecticut, October 2008
SMART Programs President and Trainer
Toastmasters International, Advanced Toast Master (ATM) designation, 2006
Connecticut Wholesale liquor permit, 2002-2005
Connecticut (Federal) out-of-state shippers permit, 2002-2005
Private Pilot single engine land.  Licensed for Visual Flight Rules (VFR) and
    Instrument Flight Rules (IFR), 1991-present
Life and health insurance license, 1989-1991
Property and casualty insurance license, 1989-1991
Securities license, 1989-1991
TIPS Trainer and TIPS Master Trainer certification, 1988-2001

## EDUCATION

B.S., Biology, University of Rhode Island
B.A., Education, University of Rhode Island

*Coursework:*
Graduate courses taken in Management, Economics and Accounting

## INVITED SPEAKER

Dram Shop/Liquor Liability Seminar: Middlesex Bar Association, January 2009
Security Supervision Seminar: New England Bar & Tavern Association, January
    2009
Social Host Liability Seminar:  University of New Haven, November 2008
Social Host Liability Seminar:  Town of Colchester CT
Dram Shop/Liquor Liability Seminar:  Connecticut Defense Attorney Association,
    October 2008
Women of the World Forum, Professional development for women, September 2008
New York University School of Technology - liquor liability
Keynote and motivational speaker on relieving stress before any presentation or
    speech, 2007-present
Industry keynote speaker, most recent:  May, 2007 Wine Educators conference, Wine
    Symposium, Naugatuck Valley Community College, 2006-present

# Robson Forensic
**Engineers, Architects, Scientists & Fire Investigators**

## ELIZABETH A. TRENDOWSKI
### Dram Shop Expert

Safe Alcohol Sales for Retail Industry, National Assn. Beverage Retailers (NABR)
National Convention, 2002

National conference of state liquor administrators:  The importance of education for
alcohol permittees and their servers, 1993-1994

The National NightClub and Bar Conventions, 1993-2003

Dram Shoppe Associates, presented liquor liability seminars throughout Connecticut
several times a year.  The seminars were open to any liquor permittee and their
staff throughout the state, 1995-2002

## INSTRUCTOR

Adjunct Professor, University New Haven

Institute for Paralegal Education (IPE), Managing People Inside and Outside the
Firm, November 2008 seminar

Connecticut Police Crime Prevention Association, 1999 - 2004

## PROFESSIONAL MEMBERSHIPS and AFFILIATIONS

New York Institute of Technology
School of Management, Faculty Advisory Board, 2008-present

Toastmasters International
Toastmasters International Area Governor June 2008 - present
District 53 Toastmasters Division speech contest winner 2008
Toastmasters International Club Coach
Faculty, TLI Officers Training Institute, 2007-present
President, 2007
Vice President Membership, 2006-2007

University of New Haven Advisory boards, 2007-present
Board Committee Adjunct Professors
Board Committee Hospitality Department

Mentor for Connecticut kids in D.C.F. (The Journey House) Willimantic, CT, 2006-
present

Connecticut coalition to stop underage drinkers, 2004-present

Connecticut Restaurant Association Board of Directors, 2000-2002
CRA Education Chair person

# Robson Forensic
**Engineers, Architects, Scientists & Fire Investigators**

### ELIZABETH A. TRENDOWSKI
### Dram Shop Expert

President:  C.H.E.F.  Connecticut Hospitality Educational Foundation
responsible for all Connecticut schools offering hospitality courses and
degrees.  The Connecticut Schools involvement ranged from high school
to four-year college and universities.  C.H.E.F. raised money for
hospitality programs and scholarships through the Connecticut Restaurant
Association.

## GRANTS

Diageo Server Training Grant, 2001-2002
Received a grant from Diageo (the world's largest liquor supplier) to provide
S.M.A.R.T. training at no cost to all interested Connecticut liquor permittees.

Department of Transportation Grant, 1993-1994
Received a DOT grant via the Connecticut Department of Liquor Control to
provide T.I.P.S. Training throughout Connecticut for all liquor permittees
wishing to participate in the certification of responsible service of alcohol.

## PUBLICATIONS

Ten years of articles in the Connecticut Beverage Journal as a monthly columnist.

# EXHIBIT "C"

INVESTIGATION OF THE CHARLES CONROY ASSAULT

By:

LANCE WATT

SEPTEMBER 23, 2009

# Robson Forensic
### Engineers, Architects, Scientists & Fire Investigators

**INVESTIGATION OF THE CHARLES CONROY ASSAULT**

**ENGINEER'S PRELIMINARY REPORT**              **SEPTEMBER 23, 2009**

## 1. INTRODUCTION

This assault occurred on November 26, 2006 at about 3:11 AM in the vicinity of 300 Market Street, Philadelphia, Pennsylvania. A bus owned by JBJ Limousine Company and operated by William Ervin had broken down. The bus had been chartered by a group of partygoers who were awaiting arrival of a back-up vehicle. Conroy, a passerby, after entering and exiting the bus, was chased down and assaulted by some of the partygoers.

The purpose of my investigation was to determine if bus driver William Ervin was in some manner responsible for the assault.

## 2. AVAILABLE INFORMATION

1. Philadelphia Police Department Incident Investigation Report No. 2006-06- 071684.1.

2. Complaint.

3. Answer of Defendants JBJ Limousine, Inc, t/a JBJ Limousine and JBJ Limousine and Bus, Inc. to Plaintiff's Complaint with Affirmative Defenses.

4. Medical Records.

5. Transcript of the August 3, 2009 deposition of Nick Ryan.

6. Transcript of the May 20, 2009 deposition of William Ervin.

7. Transcript of the August 3, 2009 deposition of Janene Castellucci.

8. Transcript of the June 11, 2009 deposition of James Brian Johnson.

9. Transcript of the May 20, 2009 deposition of Charles Conroy.



**Robson Forensic**
Engineers, Architects, Scientists & Fire Investigators

1

### 3. DESCRIPTION OF THE ASSAULT

The Police Report states:

> There was a report of an assault @ 3:15 am at 300 Market Street on 11/26/06.
> The Complainant was in a verbal dispute with the offenders and was struck in the
> face. The Complainant was advised 34 S 11th Street.

LBJ Limousine Company had been contracted to provide transportation services for a group of about twenty partygoers who were celebrating Janene Castellucci's 21st birthday.

Ervin dropped the partygoers off in Philadelphia so that they could go bar hopping (Ervin Page 33). At about 2:00 AM, he received a call to pick the partygoers up on 3rd Street, between Chestnut and Market Streets (Ervin Page 33). Shortly after picking up the partygoers the bus broke down. Ervin coasted the bus to the side of the road on Market Street and turned on his hazard lights (Ervin Page 34).

Ervin placed a call to James Brian Johnson, the owner of JBJ Limousine while he was still on the bus, to request a back-up vehicle to transport the partygoers back to their point of origin. Ervin testified that he got off the bus to stretch his legs along with four of the partygoers who wanted to smoke. The balance of the partygoers remained on the bus (Ervin Page 35). Ervin also testified that he stood outside the bus' front door, about 3-feet away (Ervin Page 37) and that two passersby came down the street and mouthed off to the partygoers that were outside the bus with him (Ervin Page 38).

Ervin further testified that:

> That he didn't see a fight (Ervin Page 40).
> That he didn't see the passersby try and get on the bus (Ervin Page 42).
> That Police separated two persons, one off the bus and one of the passersby and
> took statements (Ervin Page 44).
> That there were no cans, bottles or a beer keg on the bus (Ervin Page 46).
> That the passersby went past him and he lost sight of them (Ervin Page 47).
> That he stood by the bus door to make sure nobody got on the bus, and that he has to
> stay with the bus at all times (Ervin Page 48).
> That he did not talk to the Police (Ervin Page 50) and,
> That he did not make out any report (Ervin Page 51).

James Brian Johnson testified that when he got to the bus the driver was on it, there was no ambulance, no Police, and he wasn't questioned by the Police (Johnson Page 80).

Johnson further testified that he learned about the fight from Ervin the next day (Johnson Page 81).



**Robson Forensic**
Engineers, Architects, Scientists & Fire Investigators

2

Jean Castellucci testified that:

> There was beer on the bus (Castellucci Page 13).
> That she stayed on the bus while some of the partygoers got off the bus to smoke and others went to get some food.  Also, that the fight took place outside the bus and that she didn't witness it, and that she remembers someone came onto the bus, said something, and threw a beer (Castellucci Page 18).

Castellucci further testified that when the person who had entered the bus got off, that everyone got rowdy; a couple of the passengers got off the bus and the fight broke out (Castellucci Page 19).  According to Castellucci, it took about 1½ hours for the back-up transportation to arrive.  Castellucci also testified that she believed there was a little keg of beer on the bus, and that the thrown beer hit her sister (Castellucci Pages 24, 29 & 31).

Charles Conroy testified that he was with two roommates that night (Conroy Page 40), and:

> That he saw the broken down bus (Conroy Page 54).
> That he didn't see the driver (Conroy Page 54).
> That the bus door was wide open (Conroy Page 54).
> That he walked onto the bus (Conroy Page 55).
> That there was no one standing outside the bus (Conroy Page 56).
> That he walked onto the bus to see if the passengers needed some help. (Conroy Page 56)
> That he saw people on the bus as he was walking through the entrance door (Conroy Page 56).

Conroy further testified that:

> He was outgoing and social (Conroy Page 57).
> That there were 10 to 15 people on the bus and that some were standing and some were sitting (Conroy Page 57).
> That he asked them what's up and how they were they doing and that he felt completely sober (Conroy Page 58).

According to Conroy, someone told him in an aggressive manner to get off the bus, so he turned around and started to exit the bus.  He saw a table to his right with cups of beer on it, so he flicked one over before exiting the bus (Conroy Pages 60 & 62).  Conroy stated that the guy who yelled at him was about 6-feet away and that the people were predominately crowded in the rear of the bus.  Also that there was a light on inside the bus and that he doesn't remember specific people who were on the bus (Conroy Pages 65 – 68).

Conroy stated that as he exited the bus, about 6 -7 males stormed off the bus and confronted him and one of his roommates who tried to calm them down.  Shortly thereafter the fight broke out resulting Conroy being physically assaulted and suffering a broken nose and facial injuries.


**Robson Forensic**
Engineers, Architects, Scientists & Fire Investigators

3

## 4.  ANALYSIS

Ervin's bus was capable of seating 26 passengers and, based on this passenger capacity combined with the fact that the charter had originated in New Jersey, the bus was operating in Interstate Commerce and was therefore subject to the requirements of Federal Motor Carrier Safety Regulations (FMCSR).

At the time of bus breakdown, Ervin acted properly in coasting his bus to the side of the road in order to make sure that it did not pose a hazard for other motorists.  Ervin stated that he activated the hazard lights which was also proper, however, depending on the exact stopping location; he may have also had a requirement within ten minutes of bringing his bus to a stop to place additional warning devices on the roadway behind his bus.  Such warning devices would be as defined in FMCSR §393.95 (2)(i) &(ii).  These devices would be placed in a specified way depending on the situation.

Additionally, under FMCSR §396.7 (a), General – a motor vehicle shall not be operated in such a condition as to likely cause an accident or a breakdown of the vehicle.  It was subsequently determined by Johnson that the cause of breakdown of the bus was due to battery failure (Johnson Page 73).  This is indicative that the bus was not being properly inspected and maintained as required under FMCSR Part §396.1 & §396.3 (a) & (1).

It was reported by a partygoer that Ervin got off the bus and raised the engine compartment hood.  This was obviously in an attempt to try and determine if he could identify the cause of the breakdown.  Before doing this, Ervin should have first instructed his passengers to remain on the bus and seated, and in order to maintain security of the bus and his passengers, Ervin should have closed and secured the entry door behind him.

With reference to Keller's Motorcoach Driver's Safety Handbook in the sub section titled "Breakdowns" it states:

> Keep your passengers calm and on the coach.  The coach is almost always the safest place for your passengers in case of a breakdown.

In the sub section titled "Personal Security" it states:

> It is your responsibility to be on your guard at all times and to be prepared for the unexpected – not only to protect your passengers, but also to protect yourself.  The world of the professional driver, whether it be carrying a load of passengers to a theme park or waiting alone in a parking lot, can be a dangerous place.

In order for Conroy to have been able to approach the bus and gain unrestrained entry, indicates that Ervin was not stationed immediately outside of the bus' entry door as he testified he was, and that the passenger door was left in the fully open position.



**Robson Forensic**
Engineers, Architects, Scientists & Fire Investigators

4

To ensure passenger control and safety, issues that Ervin as a professional bus driver was fully responsible for, he should not have allowed any of his passengers to disembark from the bus to smoke, much less allowing some of his passengers to leave the area unsupervised to seek food.

Although inappropriate, Ervin should have ensured that the partygoers that did get off the bus to smoke were instructed to remain in a group in a safe location that was within his immediate field of view and under his direct supervision.  Again, none of the passengers should have been permitted to leave the immediate vicinity of the bus.

The passengers that did get off the bus to smoke, if present in the vicinity of the bus' entry door as Ervin testified that they were, they should have been available to prevent Conroy from gaining access the bus interior.   Obviously these patrons were not located where Ervin testified they were.

Ervin improperly maintained control over his passengers who were his responsibility and under his direct supervision at the time of the assault.

Had Ervin been positioned immediately outside of the bus' entrance door as he testified he was, Conroy could have been readily prevented from entering the bus and this assault would not have occurred.

The improper actions on the part of Ervin resulted in the assault on Conroy by some of Ervin's out of control passengers.



## 5. FINDINGS

Within reasonable engineering certainty, and subject to change if additional information becomes available, it is my professional opinion that:

1. Ervin improperly maintained control over his passengers who were his responsibility and under his direct supervision at the time of the assault.

2. Had Ervin been positioned immediately outside of the bus' entrance door as he testified he was, Conroy could have been readily prevented from entering the bus and this assault would not have occurred.

3. The improper actions on the part of Ervin resulted in the assault on Conroy by some of Ervin's out of control passengers.

Lance Watt

Heavy Truck and Bus Expert

**Robson Forensic**
Engineers, Architects, Scientists & Fire Investigators

6

# Robson Forensic
**Engineers, Architects, Scientists & Fire Investigators**

## LANCE WATT
### Bus and Truck Expert

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2000 to present | **Robson Forensic, Inc.**<br>*Associate*<br>Provide technical investigations, analysis, reports, and testimony toward the resolution of litigation involving buses, trucks, motor vehicle crashes, commercial vehicle fires, and product liability cases. |
| 1997 to 2000 | **Self-Employed Consultant**<br>Provided services to the Automotive and Transit Bus Industries and expert witness services in product litigation. |
| 1998 to 1999 | **Advanced Bus Industries, L.L.C.**<br>*Vice President – Engineering & Quality Assurance*<br>Responsible for all Engineering and Q.A. activities in the support of an existing commercial vehicle product line, while leading the design efforts on a "from the ground up" new vehicle development program for use in Transit and Commercial vehicle vocations. |
| 1996 to 1997 | **Universal Coach Parts**<br>*Director of Engineering*<br>Responsible for all engineering activity in support of parts sales for Flxible manufactured transit buses and developing new parts and product lines. |
| 1994 to 1996 | **The Flxible Corporation**                    (Bus Manufacturer)<br>*Vice President of Research & Development*<br>Responsible for all Corporate Research and Development including whole vehicle and vehicle component testing and evaluation, advanced vehicle design engineering, vehicle structural analysis, liaison with state and federal government agencies, and product safety and integrity.  Advanced vehicle design engineering projects included:  a low floor vehicle, hybrid electric vehicle, alternative fuels (C.N.G., L.N.G., L.P.G., Methanol and Ethanol) and also new low emission diesel powered vehicles with particulate traps and catalytic converters.  Other responsibilities included resolution of problems, both in-house and in the field, vehicle fire origin and cause (O&C) investigations, vendor selection, vendor qualifications, specifying of materials, parts, equipment and components and customer interface. |
| 1976 to 1994 | **The Flxible Corporation**                    (Bus Manufacturer)<br>*Director of Engineering*<br>Responsible for product design, research and development, whole vehicle and vehicle component testing and evaluation, product safety and integrity, vehicle structural analysis, options engineering, bid and proposal analysis with substantial customer interface. Responsibilities included resolution of problems, in-house and in the field, origin and cause |

# Robson Forensic

**Engineers, Architects, Scientists & Fire Investigators**

## LANCE WATT
### Bus and Truck Expert

(O&C) investigations, vendor selection and qualification and the specifying of materials, parts, equipment and components.

Previous positions held were Director of Research and Development, **Manager-Liaison** Engineering, Manager-Design Engineering, Manager-Special Projects, Manager-Product Improvement Engineering and Manager Quality Assurance.

Responsibilities included research and development, advanced vehicle design engineering, field failure analysis and problem correction, plant and customer liaison, product safety and integrity, vendor selection and qualification, material selection, product Quality Assurance and Control including Procedures and Standards.

Responsible for start up of a new bus manufacturing facility including site preparation, building construction, plant layout, plant facilitation, tooling and fixture design, tooling and fixture procurement, and the selection, specifying and justification of capital equipment. Responsible for the initial tool try out while conducting the pilot build of the Company's new Advanced Design Transit Bus within the new facility. Responsible for the design, procurement, installation and pilot operation of two processing and powder coating lines, one for aluminum extrusions and one for aluminum coil product.

1967 to    **Rohr Industries**
1976       *Senior Project Engineer*
Responsible for the design, development, prototype fabrication, test and evaluation of components used in military and commercial aircraft, private aircraft, buses and other passenger vehicles. Components consisted of gearboxes, power take-offs, propeller, turbine engine parts, fuselage structures and components for aircraft, and powertrains and body parts for vehicles. Consulted for other company divisions including problem solving and corrective designs to solve field problems and address customer issues and concerns.

1966 to    **Canadian Aircraft Products**
1967       *Design Engineer*
Responsible for aircraft component designs, stress analysis of aircraft structures for new designs as well as repairs and modifications to aircraft structures and their components. Structural testing of aircraft structures and components to validate designs and analytical predictions.

1963 to    **Several Canadian and Australian Companies**
1966       *Design Engineer*
Responsible for a variety of engineering and engineering design functions including stress analysis, product design, product development and the testing of components and equipment related to Automotive, Aircraft and Pulp and Paper Industries.

# Robson Forensic
**Engineers, Architects, Scientists & Fire Investigators**

## LANCE WATT
**Bus and Truck Expert**

## PROFESSIONAL CREDENTIALS

Medium and Heavy Truck Technician – ASE Certified
Truck Equipment Installation and Repair – ASE Certified
Medium and Heavy Truck Parts Specialist – ASE Certified
Certified Inspection Mechanic, Type 7, Commonwealth of Pennsylvania

## EDUCATION

Co-Operative - Education/Industry, Trades Course Program, 1958-1962
        Equivalent to BSME degree
Sydney Technical College, Trades Course Certificate, 1962
Sydney Technical College, Trades Course Preparatory Certificate, 1957

*Continuing Education:*
Hazardous Materials First Responder Awareness – April 2008,
        National Board on Fire Service Professional Qualifications, agency accredited
Emergency Response to Railroad Incidents – 2007
Farm Confined Space Emergencies – 2007
Farm Emergencies – 2007
Managing Machinery Entanglements – 2007
Managing Tractor Overturns – 2007
Managing Farm Chemical Emergencies – 2007
Aircraft Rescue Firefighting For Structural Firefighters – 2007
HazMat Cargo Tank Truck Awareness – 2007
SAE – Heavy Truck Handling, Dynamics & Control Symposium – 2005
SAE – Heavy Truck Rollover and Collision Avoidance TOPTEC – 2003
SAE – Motor Vehicle Accident Reconstruction – 2002
NYSTARS – Annual Joint Conference - Investigating Bus & Train Collisions – 2 001
SAE – Natural Gas Engine & Vehicle Technology TOPTEC – 1995
Grumman Allied Industries, Inc. - Managing for Productivity – 1980
Center for Professional Advancement - Powder Coating – 1976
Vancouver College – Work Study 1 – 1966

## AFFILIATIONS

National Research Council – Transportation Research Board
- Committee on Transit Fleet Maintenance (A3C02)
- Transit Co-operative Research Projects Advisory Committees

# Robson Forensic
**Engineers, Architects, Scientists & Fire Investigators**

## LANCE WATT
### Bus and Truck Expert

American Public Transit Association
- Driveline Committee
- Alternate Fuels Committee
- Americans with Disabilities Act Advisory Committee

Federal Transit Administration
- Technology Advisory Committee
- Technology Development Committee
- Wheel Chair Accessibility Specification Committee

Society of Automotive Engineers (Member)
- Various Advisory and Standards Development Committees
- Bus Engineering & Operations Committee

Pennsylvania Association of Arson Investigators (PAAI) 751-E

# Robson Forensic
**Engineers, Architects, Scientists & Fire Investigators**

**LANCE WATT**
**Bus and Truck Expert**

## SHIPPING MATERIALS ON TRUCKS
Within positions at Flxible, responsible for determining methods of handling, packaging and shipping of materials, parts and assemblies on Company trucks between plants and also on Common Carrier trucks Nationally.

This activity included weight placement and securement methods on Company owned trucks and the design of shipping and handling aids for both Company and Common Carrier trucks.

## TRUCKS AND TRAILERS
Owned, operated and maintained different types of Light, Medium and Heavy trucks. These vehicles ranged from Pick-up trucks, Straight trucks of different types (Flatbeds, Box and Dumps) over a period of about 35 years and Tractor-Trailer combinations for about 27 years.

Owned large (30-foot and longer) 5th Wheel and Recreational Pull Trailers for about 25 years.

### Driver Qualifications:
Hold a Class "A" CDL (Tractor-Trailer Combinations) with endorsements for:

- Air Brakes
- Double and Triple trailer combinations.
- Commercial Passenger Vehicles (All types except School Bus).
- Tanker Vehicles
- Hazardous Materials

### Light Truck Equipment:
Consulted for another Company that manufactured Light Truck Dock Bumpers that doubled as Trailer Hitches (Class 1 through Class IV). Performed product design and analysis and conducted physical certification testing of their products to meet regulatory requirements and to qualify the products to OEM and Aftermarket Customer requirements.

### Motor Racing:
Involved with a FORD Motor Racing Division Team (Stock Cars) as Vehicle Engineer/Designer and performed Crew Chief and Pit Crew Details from 1968 to 1971.

Worked on Midgets and have conducted Pre-Race Inspections on most types of Racecars for Rule Compliance.

### Vehicle Maintenance:
Built/re-built and worked on every kind of vehicle from Race cars to Heavy Trucks plus all associated systems, parts and components for those vehicles.

# Robson Forensic
**Engineers, Architects, Scientists & Fire Investigators**

## LANCE WATT
### Bus and Truck Expert

## TRUCK EXPERTISE

Experience in vehicle design includes the selection, integration, evaluation and testing of components and systems into buses, coupled with ownership, operation and maintenance of trucks up to and including Class 8 tractor trailer combinations.

Heavy truck and large bus components and on-board systems designs, operation and maintenance including:

- Steering Systems.
- Brake Systems.
- Diesel Engines.
- Transmissions (Manual and Automatic).
- Steer and Drive Axles.
- Tag and Pusher Axles (Self-Steer and Air Dump).
- Air Suspension Systems.
- Leaf Spring Suspension Systems.
- Wheels (Hub and Stud Piloted, One, Two and Three Piece).
- Wheel Hubs (Disc and Spoke Wheels, Oil and Grease lubricated bearings).
- Tires (Bias and Radial, Tube Type and Tubeless).
- Exhaust Systems and After Treatment Devices.
- Diesel and Alternate Fuel Systems.
- Air operated Windshield Wiper and Washer Systems.
- Driver's Heater and Windshield Defroster Systems.
- Air Suspension Driver's Seats.
- Electrical System (Charging and Distribution).
- Handling and operating characteristics of tractor-trailer combinations, straight trucks and buses.

## TOWING AND RECOVERY – HEAVY VEHICLES

- Designed Special Tow and Recovery Equipment and Adapters.
- Developed Tow and Recovery Procedures.
- Supervised Tow and Recovery Activities.
- Supervised Loading and Securement of Vehicles for Transport.
- Supervised Cargo Loading, Placement, and Securement during Recovery Operations.

# Robson Forensic

**Engineers, Architects, Scientists & Fire Investigators**

### LANCE WATT
### Bus and Truck Expert

## SPECIFIC WHEELCHAIR LIFT AND SECUREMENT SYSTEM EXPERIENCE

- Worked with the Architectural Barriers Board, the Urban Mass Transit Administration (UMTA), researchers, federal and state regulators and industry representatives on a committee charged with developing specifications and requirements for transit bus wheelchair lifts, wheelchair ramps, and wheelchair securement systems. This committee work resulted in the initial Americans with Disabilities Act (ADA) pertaining to transit buses.

- Worked with the Cleveland Clinic on various contracts aimed at developing advanced wheelchair passenger securement systems and the testing of those systems.

- Worked with groups involving vehicle manufacturers, wheelchair and mobility product manufacturers, manufacturers of mobility and securement devices, and federal and state government regulators to ensure compatibility between vehicles, the various types of mobility aid products, the various types of mobility aid securement systems, and related devices and the use thereof.

- Assisted three wheelchair lift manufacturers with the development, qualification testing, and regulatory compliance of their products.

- Worked with the California Highway Patrol on development of performance standards and test procedures for wheelchair lifts. This work was in response to various incidents in California that resulted in serious injuries and death to wheelchair users while using wheelchair lifts on transit buses.

- My employees, during my tenure with Flxible, designed, developed, tested, qualified, and certified a wheelchair lift and its related control systems for use in our own vehicles and which could also be readily adapted or retrofitted into vehicles manufactured by others.

# Robson Forensic

**Engineers, Architects, Scientists & Fire Investigators**

### ELIZABETH A. TRENDOWSKI
**Dram Shop Expert**

## PROFESSIONAL EXPERIENCE

**2007 to present**   **Robson Forensic, Inc.**     Oct. 2008-present
*Connecticut Area Manager*
*Associate*
Provide technical investigations, analysis, reports, and testimony towards the resolution of litigation in the areas of dram shops and liquor liability for on and off premises liquor permittees, and issues of supervision, i.e. cases involving underage drinking and the responsibility of parents, party hosts, schools, fraternities, etc. TIPS or SMART certified over 200 police officers, liquor agents and security professionals around the country.

**2006 to present**   **University of New Haven, School of Hospitality**
*Adjunct Professor*
HR-315 is a three-credit, junior-level course in Bar and Beverage Management. This course teaches hospitality students the mechanics of operating a successful beverage operation whether it is in a five-star dining facility or a large sports coliseum. Students learn how to master costs, set-up, labor and legal issues. Students also participate in the S.M.A.R.T. trainer certification workshop where upon successful completion they are certified S.M.A.R.T. trainers able to certify their own staff as needed.

**1999 to 2008**   **Servers and Managers Alcohol Responsibility Training** (S.M.A.R.T. Programs)
*CEO*
Created national certification course in the responsible service of alcohol. This program also includes checking identifications properly, intervention and a certification test. To date there are over twenty-two thousand certified S.M.A.R.T. servers and over four hundred and fifty certified S.M.A.R.T. trainers.

S.M.A.R.T. Programs is a certified alcohol server program dealing with the issues of alcohol in the marketplace. S.M.A.R.T workshops facilitate what alcohol is, the effects of alcohol on guests, checking IDs properly, legal issues, intervention as well as guest relations. There is a certification test at the end of the workshop where participants need to receive seventy-five percent correct to become certified.

**1993 to present**   **The Beverage Journal**
*Columnist*
Wrote "S.M.A.R.T. Things" for monthly hospitality industry column focusing on liquor liability issues, staff training and current interests in the hospitality industry.

# EXHIBIT "D"





**Login** to access your
**Personal Training Portal**

*username or email address*          *password*

Login

**Click if you forgot your password**

Home



**Learn More**

**Get Training**

**TIPS for the
University**

**Register**

**Contact Us**







## Leading The Way in Responsible Alcohol Service Training For Over 20 Years...

TIPS (Training for Intervention ProcedureS) is the global leader in education and training for the responsible service, sale, and consumption of alcohol. Proven effective by third-party studies, TIPS is a skills-based training program that is designed to prevent intoxication, underage drinking, and drunk driving.

### Get TIPS Certified

To become TIPS Certified, you must attend a training session or take an online course.

### Become a TIPS Trainer

To certify as a trainer, you must successfully complete a two-day workshop. More.



*TIPS helps prevent...*

*Alcohol Abuse*

**State News**

Tennessee has approved TIPS as a provider for their voluntary Responsible Vendor Program for off-premise beer establishments.

Nevada has approved TIPS as a provider... More.

Utah has approved eTIPS for certification... More.

**In The News**

TIPS certification offered to LaCrosse, WI community... more

**Click here for Press Releases**

**Click here for Testimonials**

Health Communications, Inc. : 1101 Wilson Boulevard : Suite 1700 : Arlington, VA 22209 : 1-800-GET-TIPS

☐ 2005 Health Communications, Inc. All rights reserved Terms and Conditions Privacy/Policy Site Map Industry Links Contact Us Login Instructions

# EXHIBIT "E"

JANENE CASTELLUCCI

Page 1

UNITED STATES DISTRICT COURT
for the
- - -

| | | |
|---|---|---|
| CHARLES CONROY, | : | CIVIL ACTION NO: |
| | : | 09-1215 |
| Plaintiff, | : | |
| | : | |
| -V- | : | |
| | : | |
| JBJ LIMO, INC., et | : | |
| al., | : | |
| | : | |
| Defendant. | : | |

- - -
Monday, August 3, 2009
- - -

ORAL TESTIMONY of JANENE CASTELLUCCI, taken
pursuant to notice, held at the law offices of DOUG
BAKER, 236 Pine Valley Lane, Sewell, New Jersey 08080,
commencing at 10:05 a.m., before Jean M. Walker, Court
Reporter - Notary Public there being present:

STREHLOW & ASSOCIATES
FULL SERVICE COURT REPORTING AGENCY
258 SOUTH STATE STREET
1ST FLOOR, REAR BUILDING
NEWTOWN, PENNSYLVANIA 18940

(215) 504-4622

SERVING NJ, PA, NY & DE

WWW.STREHLOWCOURTREPORTING.COM

JANENE CASTELLUCCI

Page 2

1  APPEARANCES:
2
3  LAW OFFICES OF JAMES N. GROSS
   BY:  JAMES N. GROSS, ESQUIRE
4       1616 Walnut Street, Suite 1110
        Philadelphia, Pennsylvania 19103
5       (215) 670-9926
6
       Representing the Plaintiff
7
   WEBER, GALLAGHER, SIMPSON, STAPLETON, FIRES
8  & NEWBY, LLP
   BY:  ROBERT D. MacMAHON, ESQUIRE
9       2000 Market Street, Suite 1300
        Philadelphia, Pennsylvania 19103
10      (215) 972-7935
11      Representing the Defendant
12
13 LAW OFFICES OF DOUG BAKER
   BY:  DOUG BAKER, ESQUIRE
14      236 Pine Valley
        Sewell, New Jersey 08080
15      (856) 464-2511
16      Representing Janene Castellucci
        and Nick Ryan
17
18
19
20
21
22
23
24

Page 3

1
        INDEX
2
3
4  WITNESS              PAGE
5
   JANENE CASTELLUCCI
6  (Witness sworn.)
7  DIRECT EXAMINATION
   BY: MR. GROSS            5
8
9  CROSS-EXAMINATION
10 BY: MR. MacMAHON          24
11
   REDIRECT EXAMINATION
12 BY: MR. GROSS            33
13
   RECROSS EXAMINATION
14 BY: MR. MacMAHON          34
15
16
17
18       EXHIBITS
19
20 NO.    DESCRIPTION      PAGE
21    Whereupon, no Exhibits have been marked.
22
23
24

Page 4

1        (It is agreed by and between
2  counsel that the reading, signing,
3  sealing, filing, and certification are
4  hereby waived and all objections, except
5  as to the form of the questions, are
6  reserved until the time of trial.)
7        ---
8        JANENE CASTELLUCCI, after having
9  been duly sworn, was examined and
10 testified as follows:
11
12       MR. MacMAHON:  You know what, it
13 just occurred to me that because, I'm
14 sorry, Nick, right?
15       MR. RYAN:  Yes.
16       MR. MacMAHON:  Technically, I
17 don't think you can be here because
18 they're both fact witnesses and they
19 should be sequestered.  No offense, Nick.
20 It's just that you're both fact witnesses
21 and the implication is that you have to
22 give your testimony based on your own
23 memory.  In other words, the implication
24 is if you hear what she's going to say it

Page 5

1  could somehow subconsciously affect your
2  testimony and what you remember.  So I ask
3  that they be sequestered.
4        MR. BAKER:  If I put them in the
5  living room to watch TV, is that
6  satisfactory?
7        MR. MacMAHON:  Yes.  That's
8  fine.  The point is, you're not supposed
9  to hear what she's going to say.
10       MR. RYAN:  That's fine.
11       MR. BAKER:  You should be in a
12 vacuum so to speak.  I know that's not a
13 legal term.
14       (At this time, Nick Ryan left
15 the room.)
16       ---
17       DIRECT EXAMINATION
18       ---
19 BY MR. GROSS:
20 Q.    Janene, good morning.
21 A.    Good morning.
22 Q.    Thank you for showing up.  We appreciate
23 it.
24 A.    You're welcome.

2 (Pages 2 to 5)

JANENE CASTELLUCCI

Page 6

1    Q.       My name is Jim Gross.
2    A.       Okay.
3    Q.       And Mr. Baker may have alerted you, I
4    represent the plaintiff in an action against JBJ
5    Limousine Company.
6    A.       Okay.
7    Q.       It has nothing to do with you personally.
8    It won't have anything to do with you personally.
9    It's about the events that took place on a
10   particular evening.  And it's a personal injury
11   action involving my client and so I'm just searching
12   for information, and what you recollect happened
13   that evening, and who was with you, et cetera, and
14   those types of facts.
15   A.       Okay.
16   Q.       Mr. Baker already alerted you about the
17   purpose of this, it's not a deposition, we're just
18   searching for the information.  It's different than
19   a deposition because you're not a party to this, et
20   cetera.  But if at any time you're uncomfortable
21   with anything, you just need to tell me that or tell
22   Mr. Baker.  It's not a problem.
23   A.       Okay.
24   Q.       If you have a question, a problem, you

Page 7

1    make it known.
2    A.       Okay.
3    Q.       Don't guess about anything.  If you don't
4    remember you just tell us that, whatever you know,
5    and just the facts of that evening, if you recall.
6    A.       Okay.
7    Q.       All right?
8    A.       Yes.
9    Q.       So with that being said, Janene, can you
10   give us your date of birth?
11   A.       11/21/1985.
12   Q.       And your current address is?
13   A.       219 Tall Pines Drive, Sewell, New Jersey
14   08080.
15              MR. MacMAHON:  Can you give me
16   the street?  I didn't hear it.
17              THE WITNESS:  Tall Pines, two
18   separate words.
19              MR. MacMAHON:  Okay.  Thank you.
20   BY MR. GROSS:
21   Q.       And are you employed right now?
22   A.       No, not currently.  I'm looking for a job.
23   Q.       Well, good luck with that.
24              MR. BAKER:  She just graduated

Page 8

1    with her Master's in education.
2              MR. GROSS:  Master's?  That's
3    wonderful.
4              MR. BAKER:  They're not as easy
5    to come by as you would think.
6              THE WITNESS:  Not today.
7    BY MR. GROSS:
8    Q.       What level, elementary?
9    A.       I have a duel major, elementary and
10   special ed.
11   Q.       And where did you get your degree from?
12   A.       Widener University.
13   Q.       That's great.  Well, I hope you find
14   something.
15   A.       Thank you.  I hope so too.
16   Q.       I'm sure you will.
17              MR. BAKER:  You have an
18   interview this afternoon, don't you?
19              THE WITNESS:  Um-hum.
20              MR. BAKER:  She was supposed to
21   have an interview at ten today but I said,
22   no, it's too much of a hassle to switch
23   everything around so she switched the
24   interview just for you guys.

Page 9

1              MR. GROSS.  That's very nice.
2    Thank you.
3              THE WITNESS:  Yeah.
4              MR. GROSS:  Good luck.
5    BY MR. GROSS:
6    Q.       So I'd like to take you back to the date
7    of November 26, 2006.  It was a night involving the
8    rental of a bus, actually, from JBJ Limousines.  And
9    can you tell me what event precipitated, or gave
10   rise to renting the limo, or renting the bus, I
11   should say?
12   A.       It was my 21st birthday so instead of
13   driving --
14   Q.       Right.
15   A.       -- to the bar, my mom ordered us a bus.
16   Q.       All right.  And had you ever used their
17   service before?
18   A.       Yes, we have.
19   Q.       In what type of --
20   A.       I, personally, didn't order it but for my
21   sister's bachelorette, occasions like that, we may
22   have used JBJ.
23   Q.       All right.  You had been on their -- you
24   had been on their bus or limos before?

3 (Pages 6 to 9)

JANENE CASTELLUCCI

Page 10

1   A.      I'm pretty sure.  I'm not positive.
2   Q.      It's all right.  I'm not holding you to
3   anything.  It's quite all right.  So your 21st
4   birthday was the 21st; is that correct?
5   A.      Yes.  It was a Tuesday, I believe, that
6   year.
7   Q.      And so JBJ sent over a bus that evening?
8   A.      Um-hum.
9   Q.      And if I could ask, who were you with that
10  night; do you recall?
11  A.      Friends, family, friends of friends.
12  Q.      Right.  So friends of friends, friends,
13  and family?  Can you give us some of the names of
14  people that were there that night?  Again, it
15  doesn't involve them directly.
16  A.      My sister, my sister's boyfriend.
17  Q.      Can you give us the relationship and the
18  names?  In other words, your sister and her name?
19  A.      My sister, Tara Castellucci and her
20  boyfriend, Dave Maryles.
21  Q.      Maryles?
22  A.      Um-hum.
23          MR. MacMAHON:  How do you spell
24  that?

Page 11

1           THE WITNESS: M-A-R-Y-L-E-S.
2   BY MR. GROSS:
3   Q.      And any other family members?
4   A.      My cousin Louis.
5   Q.      Louis?  And what is Louis's first name if
6   I can ask?
7   A.      Louis.  You mean last name?
8   Q.      I'm sorry.  Last name.
9   A.      Cacciola.
10  Q.      Can you spell that?
11  A.      C-A-C-C-I-O-L-A.
12  Q.      And what about some of your friends?  Can
13  you tell us, again, some of your friends that were
14  present that night?
15  A.      I, honestly, I was trying to think of --
16  I'm not 100 percent on all of them.
17  Q.      That's all right.
18  A.      But I know a few girlfriends I can name.
19  Q.      That's fine?
20  A.      Eileen Mantici, M-A-N-T-I-C-I, Brittany,
21  these are my two roommates from college, Crocetto,
22  C-R-O-C-E-T-T-O.
23  Q.      Any high school friends?
24  A.      Yeah.  Eileen was.  I can't remember any

Page 12

1   other girls honestly.  I can't remember who on my
2   birthday this year came out.
3   Q.      Okay.  Any other friends that you recall,
4   male friends?
5   A.      I'm not 100 percent sure so I don't want
6   to give a name.  You know, if I'm really not
7   100 percent sure so I don't want to give a name if
8   they weren't there.
9   Q.      Okay.
10  A.      If I'm guessing -- like I said, I don't
11  want to guess, right?
12  Q.      Right.  Okay.
13  A.      Nick.
14  Q.      Nick Ryan?
15          MR. MacMahon:  The token
16  Irishman?
17          THE WITNESS:  Hm?
18          THE MacMahon:  The token
19  Irishman?
20          MR. BAKER:  Yeah.  He's the
21  token Irishman.
22          MR. MacMAHON:  We have Cacciola,
23  Mantici, Crocetto, Castelluci.  Nick, they
24  let you in?

Page 13

1           THE WITNESS:  Some people I'm
2   not even that close with anymore that came
3   out.  Like, the girl I remember, Danielle
4   Munyon was there.
5   BY MR. GROSS:
6   Q.      Munyon?  Can you spell the name?
7   A.      M-U-N-Y-O-N.  But I don't even speak with
8   her anymore.
9   Q.      That's okay.  That's all right.
10          MR. BAKER:  This was almost,
11  what?
12          THE WITNESS:  Three years ago.
13          MR. GROSS:  I know.  It's hard.
14          THE WITNESS:  It's tough.  I'm
15  not really positive.  I'm sorry.
16  BY MR. GROSS:
17  Q.      It's okay.  Any other boys that you
18  recall?  Any other men?
19  A.      No.
20  Q.      Okay.  Was there any beer or liquor that
21  was brought onto the bus that you remember?
22  A.      Yes.
23  Q.      Okay.  And again, as far as the liquor or
24  beer that was brought on the bus --

4 (Pages 10 to 13)

JANENE CASTELLUCCI

Page 14

1  A.     Um-hum.
2  Q.     -- do you know who supplied it?
3  A.     No.
4  Q.     Okay.  Do you remember the driver?
5  A.     No.
6  Q.     Do you remember if the driver -- you don't
7  remember his facial features?  Do you remember there
8  being a driver there?
9  A.     I remember there was a driver but I don't
10 remember what he looks like, any features.
11 Q.     All right.  Do you remember if there was
12 anything asked by the driver about anybody's
13 ability, their ages, or whether they could drink or
14 not?
15 A.     Not that I recall.  No, I don't remember.
16 Q.     Okay.  And I, excuse me for forgetting,
17 did you say people brought the liquor on the bus,
18 not anybody in particular, or did the bus or van
19 have liquor on it?
20 A.     No, we brought it on.
21 Q.     You brought it on?  Okay.  So how many
22 people do you think, just roughly, that you can
23 recall, were part of the group?
24 A.     Maybe like, 15.  I'm estimating.

Page 15

1  Q.     All right.  Were there friends of friends?
2  A.     Um-hum.
3  Q.     Have you met these people, these friends
4  of friends, do you recall that?
5  A.     That night?
6  Q.     Prior to that evening?
7  A.     I'm not sure.
8  Q.     Okay.
9  A.     Because, you know, girlfriends' boyfriends
10 maybe, they were dating at the time.
11 Q.     Sure.
12 A.     New faces that I've never met.
13 Q.     Okay.  And do you recall who set up the
14 evening as to where to go, which places to go?
15 A.     I think I did, maybe.  I think we just
16 said we would go to Old City.
17 Q.     Are you familiar with Old City?
18 A.     Yeah.
19 Q.     Were there a couple bars there in
20 particular that you recall going to?
21 A.     I know we went to Mad River but I don't
22 remember the names of other bars we went to.
23 Q.     Were they all on a particular street?
24 A.     Have you ever been to Old City?

Page 16

1  Q.     Sure.
2  A.     Yeah.  It's like, a strip of bars.  I
3  think we just -- everybody got split up.  We just
4  barhopped.
5  Q.     Right.  Do you remember the number of the
6  street?
7  A.     No.
8  Q.     Fourth Street, Third Street?
9  A.     I don't remember.
10 Q.     Can you tell me a little bit what you
11 remember about the bus itself?  In other words, how
12 it was set up.
13 A.     What do you mean how set up?  The seating?
14 Q.     Well, yeah, like the seating.  Was there
15 --
16 A.     I think it was leather couches all around.
17 I'm pretty sure.
18 Q.     Okay.  Do you remember whether there were
19 any tables?
20 A.     I don't think there were tables.  Not that
21 I remember.  I don't know.
22 Q.     Was there a refrigerator, if you recall?
23 A.     I don't remember.
24 Q.     Do you recall how many entrances or exits

Page 17

1  there were to the bus?
2  A.     I just know we used the main one.  I'm not
3  sure if there were other ones.
4  Q.     Do you recall, approximately, what time
5  the bus would have picked you up that evening?
6  A.     I don't remember.  Maybe, I'm estimating
7  again, maybe 8 o'clock, 9 o'clock.  I'm really not
8  sure though.
9  Q.     You said the group split up --
10 A.     Yes.
11 Q.     -- at some point?
12 A.     Um-hum.
13 Q.     Did the bus stay -- did it leave you in
14 one particular spot and then pick you up again or
15 what do you remember?
16 A.     It dropped us off at, I think Mad River.
17 I'm not positive.  I think that was the first bar it
18 dropped us off at and then picked us up again at the
19 end of the night but I don't know where.  Wherever
20 we ended up.  I'm not sure.
21 Q.     Now, from the point that you ended up, do
22 you recall that there was an incident involving a
23 fight of certain people from outside the bus with
24 people inside the bus?

5 (Pages 14 to 17)

JANENE CASTELLUCCI

Page 18

1    MR. MacMAHON:  Objection to the
2  form.  You can answer.
3    THE WITNESS:  I remember the bus
4  broke down and we were on the side of the
5  road.  We were all sitting there, you
6  know, getting pretty restless.  People
7  were leaving to go smoke a cigarette.
8  People were leaving to go get food.  I
9  stayed on the bus.
10 BY MR. GROSS:
11 Q.    Okay.
12 A.    Because we were waiting.  They said they
13 had called for another bus to come get us.  We were
14 there for a while.  And then the fight took place
15 outside but I, personally, didn't witness it.
16 Q.    You were on the bus at the time?  And did
17 you see anybody enter the bus at any point that was
18 not part of your group?
19 A.    Yes.
20 Q.    And do you recall what, if anything, this
21 person did or these people did?
22 A.    I just remember he came onto the bus, said
23 something, I don't know what he said, and then he, I
24 remember, threw a beer.

Page 19

1  Q.    Okay.
2  A.    And then that's when, I guess, when
3  everybody got rowdy.  Then he left and a couple
4  people got off the bus but I don't remember who.
5  And then, I guess, that's when the fight happened.
6  Q.    So how long was it until you then moved
7  from that bus to another vehicle, approximately?
8  A.    Maybe an hour and a half.  I don't really
9  remember.  It was a good amount of time.
10 Q.    And how soon after the -- I know you
11 didn't witness it --
12 A.    Um-hum.
13 Q.    -- but do you remember people talking
14 about the fight at all?
15 A.    It was a lot of commotion because I know
16 that the cops came and they were checking all the
17 people that were there.
18 Q.    Okay.  You mentioned that the police or
19 the cops checked people that were there.  What do
20 you mean when you refer to, when you say, checking
21 people that were there?
22 A.    Well, they came after and, I think, they
23 made all the guys line up that were there.  There
24 may have been other people.  I'm not sure.  I just

Page 20

1  remember they asked for all the guys to check their
2  hands.  And the girls were -- I don't know where we
3  were.  I don't remember.  But I remember they
4  checked all the guys to check to see if they were
5  involved.
6  Q.    Do you recall, while on the bus waiting
7  for new transportation to come, do you recall if
8  there was any drinking going on?
9  A.    I don't think so.
10 Q.    If there had been drinking going on while
11 you were leaving New Jersey to go to Philadelphia,
12 can you tell me what, if anything, what type of
13 beverage --
14 A.    Beer.
15 Q.    -- was ingested?
16    MR. MacMAHON:  I object to the
17 form.  Go ahead.
18    THE WITNESS:  Beer.  I mean, a
19 friend may have bought me a bottle for my
20 birthday, a bottle of liquor, but I don't
21 really remember drinking that.
22 BY MR. GROSS:
23 Q.    Okay.
24 A.    I just remember beer.

Page 21

1  Q.    Okay.  You do remember being in Mad River
2  in particular?
3  A.    Um-hum.
4  Q.    Do you remember being in Mad River with
5  some of the people that you just mentioned, as those
6  you remember, as you were able to tell us, were part
7  of your party that night, the names you just
8  mentioned?
9  A.    Were they with me?
10 Q.    In Mad River?
11 A.    Yeah, I think so.  I think I remember
12 everybody went in to Mad River.
13 Q.    Do you recall the other bar that people
14 may have gone to?
15 A.    No.  There are so many bars.  Like I said,
16 people got split up and I don't know where people
17 went.
18 Q.    And where was the designated -- after
19 going from one bar to another, where was the
20 designated spot people were to meet at?  Was there a
21 designated spot?
22 A.    I'm pretty sure but I don't remember, like
23 I said, I don't remember where we got picked up.
24 Q.    Okay.

6 (Pages 18 to 21)

JANENE CASTELLUCCI

| Page 22 |
| --- |

1  A.      It wasn't Mad River.
2  Q.      Did JBJ, when the new transportation came,
3  did you have any contact with the person that was
4  there helping to transport the people over to the
5  new bus?
6  A.      I don't remember.  You mean somebody from
7  JBJ?
8  Q.      Yes.
9  A.      I don't remember.
10  Q.      Are you familiar with the owner of JBJ?
11  A.      No.
12  Q.      Do you know where JBJ is in relation to
13  this neighborhood?
14  A.      Do I know where they're located?
15  Q.      Do you know where the location is?
16  A.      I think, kind of, maybe, I'm not sure.
17  Q.      Have you ever been there?  Have you been
18  to the location?
19  A.      I think I know where it's at.
20  Q.      Yes?
21  A.      Near the Deptford Mall, maybe.  I think I
22  may have passed it and seen the limos outside but
23  I've never been there, personally.
24           MR. GROSS:  Okay.  That's all I

| Page 23 |
| --- |

1  have.
2           MR. MacMAHON:  I have a couple
3  follow-ups, Janene.
4           - - -
5        CROSS-EXAMINATION
6           - - -
7  BY MR. MacMAHON:
8  Q.      Again, I'm Rob MacMahon.  I represent JBJ.
9  A.      Okay.
10  Q.      The defendant in this case.
11  A.      Okay.
12  Q.      You said you recall that the bus driver
13  with the bus dropped all of you off at one location.
14  You think it was Mad River?
15  A.      Yes.
16  Q.      And then you guys did your barhopping the
17  rest of the night --
18  A.      Um-hum.
19  Q.      -- and then the bus picked you all up at
20  the end of the night?
21  A.      Yes.  We didn't see him until the end of
22  the night.
23  Q.      Okay.  So in other words, the bus isn't
24  taking you from bar to bar?

| Page 24 |
| --- |

1  A.      No, we walked.
2  Q.      Okay.  I think you said in response to
3  Attorney Gross's questions that you do remember that
4  there was some type of liquor on the bus --
5  A.      Um-hum.
6  Q.      -- on the way there?
7  A.      Um-hum.
8  Q.      Is that a yes?
9  A.      Yes.  I'm sorry.
10  Q.      You have to give us an answer because it's
11  hard to record um-hum.
12  A.      Yes.
13  Q.      Do you, specifically, recall what type of
14  alcohol this was?
15  A.      Beer.
16  Q.      Okay.  Do you know what type of beer?
17  A.      I think we had a keg like, a little one.
18  Q.      What do you mean by, little one?
19  A.      What's the smallest size?  A quarter keg?
20  I'm pretty sure.  I'm not positive like I said, but
21  I know we didn't have 30 packs on there.
22  Q.      So you didn't have bottles or cans?
23  A.      No.  No.  We had cups; plastic, red cups,
24  I think.  No, there was no bottles.

| Page 25 |
| --- |

1  Q.      No bottles or cans?
2  A.      (Non-verbal response.)
3  Q.      That's a no?
4  A.      No.
5  Q.      And do you know who brought the beer on
6  the bus?
7  A.      No.
8  Q.      It didn't come from the bus driver,
9  correct?
10  A.      No.
11  Q.      Did you discuss with the bus driver before
12  the trip began that someone would be drinking beer?
13  A.      I think we asked prior because we wouldn't
14  just bring it on.
15  Q.      Do you know if it was you that asked?
16  A.      No, I don't remember.
17  Q.      Do you know what was asked?
18  A.      I don't remember.  Maybe, just are we
19  allowed alcohol on the bus.
20  Q.      Were you part of that actual conversation
21  with the driver?
22  A.      No.
23  Q.      Do you know who was?
24  A.      No.

7 (Pages 22 to 25)

JANENE CASTELLUCCI

Page 26

1   Q.      Okay.  Were you actually there for the
2   conversation?  In other words, present?
3   A.      No.
4   Q.      Have you -- I know this is a stupid
5   question but how do you know that conversation took
6   place if you weren't there?
7   A.      I just know I wouldn't bring a keg on a
8   bus not knowing if it was allowed.  I just -- you
9   know?
10  Q.      Are you making an assumption that that
11  conversation took place?
12  A.      I guess, yes then.
13  Q.      Okay.
14          MR. BAKER:  Maybe your mom asked
15      the question when she ordered the bus?
16          MR. MacMAHON:  Hold on a second.
17      I'm objecting to any question unless --
18          MR. BAKER:  I'm just trying to
19      get to the right answer, that's all.
20  BY MR. MacMAHON:
21  Q.      Let's go back through this because I want
22  to make sure the record's clean.
23  A.      Okay.
24  Q.      You, yourself, had no conversation with

Page 27

1   the driver about bringing liquor on, correct?
2   A.      Correct.
3   Q.      You, yourself, were not present for any
4   conversation with the driver about whether or not
5   liquor was allowed on the bus?
6   A.      Correct.
7   Q.      You are assuming that a conversation like
8   that took place, correct?
9   A.      Correct.
10  Q.      Okay.  While on the trip from New Jersey
11  to Philadelphia, did you make any comment to the
12  driver that there was drinking going on?
13  A.      I don't remember.
14  Q.      Similar question; while on the trip from
15  New Jersey to Philadelphia, were you aware or did
16  you hear anybody say anything to the driver about
17  drinking going on?
18  A.      I don't remember.
19  Q.      Did the driver say anything to anybody
20  about drinking during the trip from New Jersey to
21  Philadelphia?
22  A.      Not that I recall.
23  Q.      Do you know, specifically, whether the
24  driver knew there was alcohol on the bus?

Page 28

1   A.      No.
2   Q.      Okay.  You were 21 at the time of this
3   trip, correct, Janene?
4   A.      Correct.
5   Q.      Tara was 21 at the time?
6   A.      No.
7   Q.      How old is Tara?
8   A.      She's 28 now.
9   Q.      Oh, okay.  Tara's older?
10  A.      Yes.
11  Q.      What about Dave Maryles, was he 21 or
12  older at the time?
13  A.      He's 27 now.
14  Q.      How about Louis Cacciola, was he 21 or
15  older at the time?
16  A.      Older.
17  Q.      All right.  What's Nick's birthday?
18  A.      7/20/1985.
19  Q.      Okay.  So Nick was 21 or older at the
20  time?
21  A.      Um-hum.
22  Q.      Is that a yes?
23  A.      Yes.
24  Q.      Okay.  How about Eileen Mantici, was she

Page 29

1   21 or older at the time?
2   A.      Yes, she's older than me.
3   Q.      Okay.  How about Brittany Crocetto, was
4   she 21 or older at the time?
5   A.      Yes.  I believe everyone on the bus was of
6   age.
7   Q.      When you say, of age, you mean 21 or
8   older?
9   A.      Twenty-one or older.
10  Q.      Okay.  Do you know, specifically, who was
11  drinking that beer from New Jersey to Philadelphia?
12  A.      Not specifically.
13  Q.      Okay.  Were you ever interviewed by the
14  police about what happened?
15  A.      No.
16  Q.      Were you aware -- strike that.  Do you
17  know, specifically, who was interviewed by the
18  police of the passengers?
19  A.      All I know is the police were there that
20  night and, like I said, they checked the guys'
21  hands, whoever was there, but they may have
22  collected some licenses.  I don't really remember.
23  But that's the most -- I didn't get personally
24  interviewed with the police.  That was all -- the

8 (Pages 26 to 29)

JANENE CASTELLUCCI

Page 30

1    only contact I had with the police.
2    Q.     Were you present for any interviews by the
3    police of any of your co-passengers?
4    A.     No.
5    Q.     So you're not, specifically, aware of what
6    exactly the police asked of these co-passengers?
7    A.     No.  That night?
8    Q.     Yes.
9    A.     No.
10    Q.     Let's go backwards.  Attorney Gross asked
11    you about, do you remember somebody coming on the
12    bus, and you said --
13    A.     Yes.
14    Q.     -- yes, you do.  Okay.  Who came on the
15    bus?
16    A.     A young male.  I honestly couldn't
17    remember what he looked like.  I think he was skinny
18    and he just walked on the bus.
19    Q.     What did he do when he came on the bus?
20    A.     He said something.  I don't remember what
21    he said.
22    Q.     I'm looking at my notes and I think you
23    said, He came onto the bus.  He said something.  Do
24    you know what it was he said?

Page 31

1    A.     I don't remember.
2    Q.     Okay.  Do you remember any particular word
3    that he said?
4    A.     No.
5    Q.     Do you know if anybody on the bus said
6    anything back to him?
7    A.     I don't remember.
8    Q.     You said he threw a beer?
9    A.     Um-hum.
10    Q.     Is that a yes?
11    A.     Yes.
12    Q.     Tell me about that.
13    A.     I think there was a cup of, like I said,
14    beer in the red plastic cup and he threw it.
15    Q.     Okay.  Did it land on anybody?
16    A.     I think it hit my sister, actually.
17    Q.     Okay.  Do you have any understanding as to
18    why he threw the beer?
19    A.     No.
20    Q.     Did anybody else get on the bus with him?
21    A.     Not that I remember.
22    Q.     Do you know if he was with anybody?
23    A.     No, I don't know.
24    Q.     You said you never got off the bus?

Page 32

1    A.     No.  Not until after everything happened,
2    the cops were there, and the new bus came to get us.
3    Q.     Right.  Right.  Okay.  You did not
4    actually see any physical altercation?
5    A.     No.
6    Q.     So you don't know who struck whom?
7    A.     No.
8    Q.     Okay.  Did anybody, any of your
9    co-passengers, at any time after this, say or
10    indicate to you that they actually had fought with
11    the plaintiff?
12    A.     No.
13    Q.     When this guy came on the bus, did he
14    appear intoxicated to you?
15    A.     I don't remember.
16    Q.     Okay.  I know you said you started your
17    night at Mad River.
18    A.     Yes.
19    Q.     Do you remember any other bars that you
20    hit that night?
21    A.     No, I don't remember names.
22    Q.     All right.  Do you know many bars you hit
23    that night?
24    A.     Maybe, around three.  I'm estimating.  I'm

Page 33

1    really not sure though.
2    Q.     Okay.
3    A.     More than one.
4         MR. MacMAHON:  That's it.
5         MR. GROSS:  Okay.  I just have
6    one follow-up.
7               - - -
8         REDIRECT EXAMINATION
9               - - -
10    BY MR. GROSS:
11    Q.     You remember it was a quarter keg that was
12    on the bus?
13    A.     I'm not 100 percent sure but I know we had
14    beer and I think it was -- I'm pretty sure it was
15    a --
16    Q.     Quarter keg?
17    A.     -- quarter keg.
18    Q.     Are you familiar with the size of a
19    quarter keg?
20    A.     Yes.
21    Q.     It had a tap on it?
22    A.     Yes.
23         MR. GROSS:  All right.  That's
24    all I have.

9 (Pages 30 to 33)

JANENE CASTELLUCCI

Page 34

1          MR. MacMAHON:  I have a
2     follow-up.
3          ---
4          RECROSS-EXAMINATION.
5          ---
6     BY MR. MacMAHON:
7     Q.     You said it was definitely smaller than a
8     half-keg, correct?
9     A.     I thought -- wait.  There's a full keg, a
10    half keg, and a quarter keg?
11    Q.     No.  There's no really such thing as a
12    full keg.  There's a half keg and a quarter keg.
13    A.     Okay.  If the half keg is the large, then
14    it was a quarter keg.
15    Q.     Are you sure it wasn't a beerball?
16    A.     I don't remember.
17    Q.     Do you remember what it looked like?  Was
18    it metallic, was it plastic, what did it look like?
19    A.     I know what a keg looks like, I just can't
20    remember what we had on the bus.  I just know we
21    didn't have thirty packs.
22    Q.     Okay.  Do you know who physically carried
23    on this, let's call it a beer container, onto the
24    bus?

Page 35

1     A.     No.
2     Q.     You didn't?
3     A.     Not me.  I can't lift that.
4     Q.     Do you know who purchased it?
5     A.     No, I don't remember.
6     Q.     Do you know how it got -- I assume it was
7     at your house when the bus --
8     A.     Yes.
9     Q.     -- got there?
10    A.     Yes.
11    Q.     Do you know who actually brought it to
12    your house?
13    A.     No.  I just know I didn't purchase it.
14         MR. MacMAHON:  That's it.
15         MR. GROSS:  Thank you very much.
16         (Deposition concluded at 10:34
17    a.m.)
18         MR. MacMAHON:  I just want it
19    noted on the record that Janene is being
20    called back to testify after Nick has
21    testified.
22    BY MR. GROSS:
23    Q.     I just have one quick question.  When I
24    asked you about the person that came on the bus, you

Page 36

1     said he threw a beer but then you used a hand motion
2     as if it was a flicking.
3     A.     Yes.
4     Q.     Did he flick the cup or did he throw the
5     cup?
6          MR. MacMAHON:  I object to the
7     form.  Go ahead.
8          THE WITNESS:  Flicked it.
9     BY MR. GROSS:
10    Q.     He flicked it?  Okay.
11    A.     I believe the cup was sitting on the --
12    from somebody had left it there.  And he went like
13    that (Witness indicating) and the beer flew.
14         MR. GROSS:  Okay.  That's all I
15    have.
16    BY MR. MacMAHON:
17    Q.     You, actually, saw him do this flicking?
18    A.     Yes.
19    Q.     And you said it splashed onto someone?
20    A.     My sister.
21    Q.     Did you perceive any actions of your
22    co-passengers that led to him flicking the beer?  In
23    other words, did anybody say anything to him in your
24    perception to antagonize him?

Page 37

1     A.     I don't remember.
2     Q.     Okay.
3          MR. RYAN:  It hit your sister?
4          MR. MacMAHON:  I'm sorry?
5          MR. RYAN:  I didn't know it had
6     hit her sister.
7          THE WITNESS:  Because she was
8     sitting in the front.
9          MR. MacMAHON:  That's all.
10         MR. GROSS:  Thank you both very
11    much.
12         (Deposition concluded at 10:59
13    a.m.)

10  (Pages 34 to 37)

JANENE CASTELLUCCI

Page 38

1   CERTIFICATION
2
3          I, hereby certify that the
4   proceedings and evidence noted are
5   contained fully and accurately in the
6   stenographic notes taken by me in the
7   foregoing matter, and that this is a
8   correct transcript of the same.
9
10
11
12   ------------------------------
13   Court Reporter - Notary Public
14
15
16
17          (The foregoing certification of
18   this transcript does not apply to any
19   reproduction of the same by any means,
20   unless under the direct control and/or
21   supervision of the certifying reporter.)
22
23
24

STREHLOW & ASSOCIATES, INC.
(215) 504-4622